**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | | |
|---|---|---|
| **DALTON MERRITT,** | ) | |
| | ) | **Case No. 1:21-cv-00067-DRC** |
| **Plaintiff,** | ) | |
| | ) | |
| **- vs -** | ) | **Judge Douglas R. Cole** |
| | ) | |
| **BASF CORPORATION, et al.,** | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT BASF CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant BASF Corporation ("BASF") respectfully moves this Court for an Order granting summary judgment in its favor on Plaintiff Dalton Merritt's ("Plaintiff") remaining claim, negligence. There is no genuine dispute as to any issue of material fact, and BASF is entitled to judgment as a matter of law.

In support of this Motion, BASF relies upon the accompanying Memorandum in Support, depositions and exhibits previously filed, and BASF's Motion to Exclude Certain of Plaintiff's Experts' Opinions filed contemporaneously with this Motion.

Respectfully submitted,


*/s/ Timothy J. Coughlin*
Timothy J. Coughlin (0019483)
Tim.Coughlin@thompsonhine.com
Andrea B. Daloia (0074016)
Andrea.Daloia@thompsonhine.com
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone:  (216) 566-5500
Facsimile:  (216) 566-5800


Emily G. Montion (0093625)
Emily.Montion@thompsonhine.com
Brianna D. Vollman (0101144)
Brianna.Vollman@thompsonhine.com
**THOMPSON HINE LLP**
312 Walnut Street
Suite 2000
Cincinnati, OH 45202-4024
Telephone:  (513) 352-6700
Facsimile:  (513) 241-4771

*Attorneys for Defendant BASF Corporation*

# TABLE OF CONTENTS

                                                                                    **Page**

SUMMARY OF ARGUMENT ................................................................................................. 1

   I.    Plaintiff Cannot Establish That BASF Violated Any Federal Regulation ...................... 1

   II.   Plaintiff Cannot Establish Proximate Cause .................................................................. 4

   III.  Plaintiff Lacks Admissible Expert Testimony Needed To Prove His Claim .................. 5

MEMORANDUM IN SUPPORT .............................................................................................. 6

INTRODUCTION ....................................................................................................................... 6

FACTUAL BACKGROUND ...................................................................................................... 7

   I.    Rail Tank Car GATX31085 ............................................................................................ 7

   II.   Tank Car Loading by IMTT ............................................................................................ 8

   III.  The Subject Tank Car Loading and Inspection ........................................................... 12

   IV.  BASF's TDI Customer – Adient ................................................................................. 13

   V.   The Incident .................................................................................................................. 15

   VI.  Incident Investigation by Adient ................................................................................. 18

   VII. Post-Incident Subject Valve Inspection and Testing .................................................. 20

   VIII. Plaintiff's Alleged Injuries and Damages ................................................................. 23

LAW AND ARGUMENT ......................................................................................................... 26

   I.    Standard of Review ....................................................................................................... 26

   II.   Per the Court's Prior Order, Plaintiff's Negligence Claim Fails With No
        Evidence That BASF Violated the HMTA or an HMR and That BASF's
        Violation Proximately Caused Plaintiff's Injury. ........................................................ 26

   III.  Plaintiff's Negligence Claim Fails Because BASF Did Not Violate Any
        Federal Regulation. ...................................................................................................... 28

        A.   Plaintiff admits that Federal Regulations do not compel the specific
            conduct alleged or that BASF complied. .......................................................... 29

        B.   BASF and IMTT are co-offerors, and BASF is entitled to rely upon
            IMTT's inspection of the Tank Car. ................................................................ 30

        C.   The Tank Car was properly inspected by IMTT in compliance with
            the regulations. ................................................................................................. 31

        D.   The Tank Car was properly qualified at the time it was loaded in
            compliance with the regulations. ..................................................................... 34

        E.   BASF certified its compliance with the regulations via Electronic
            Data Interchange. ............................................................................................. 39

      F.     As Bill Drum did not have to personally inspect the railcar for BASF to certify its compliance with the regulations, BASF did not violate any regulations relating to employee training. ............................................................ 42

IV.    Plaintiff's Negligence Claim Fails Because He Cannot Establish Proximate Causation.................................................................................................................... 44

      A.     There were multiple intervening causes superseding the Incident, thus cutting off BASF's liability. ................................................................. 45

      B.     Adient is a sophisticated user of TDI, and thus, BASF had no duty to warn Adient about the dangers of TDI. ............................................... 49

V.    Alternatively, Plaintiff's Negligence Claim Fails Because He Lacks Reliable Expert Testimony to Support His Claim...................................................................... 50

CONCLUSION.................................................................................................................... 51

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
   219 F.3d 519 (6th Cir. 2000) ..................................................45

*Carroll v. Osborne*,
   No. 1:23-cv-84, 2024 WL 4945131 (S.D. Ohio Dec. 3, 2024).............................................26

*Chapman v. Milford Towing & Serv.*,
   499 Fed. Appx. 437 (6th Cir. 2012).........................................................4, 45, 46, 48

*Cline v. Dart Transit Co.*,
   No. 21-3468, 2023 WL 3003190 (6th Cir. April 19, 2023)...................................49

*Devonshire v. Johnston Group First Advisors*,
   166 Fed. Appx. 811 (6th Cir. 2006).........................................................45

*Earley v. United Airlines*,
   No. 2:05-cv-0835, 2006 WL 2794971 (S.D. Ohio Sept. 28, 2006) ......................................27

*Gruenbaum v. Werner Enters.*,
   No. 09-cv-1041, 2011 U.S. Dist. LEXIS 9888 (S.D. Ohio Feb. 2, 2011) .............................27

*Hanko v. Nestor*,
   2019-Ohio-2256 ...............................................................42

*Hansen v. Wal-Mart Stores, Inc.*,
   2008-Ohio-2477 (4th Dist.) ..................................................27

*Midwest Specialties v. Crown Indus. Prods. Co.*,
   940 F. Supp. 1160 (N.D. Ohio 1996).................................................5, 49

*Nocilla v. Bridges*,
   No. 23-3184, 2023 WL 7550019 (6th Cir. Nov. 14, 2023) .............................................27, 50

*Northland Ins. Co. v. Guardsman Prods. Inc.*,
   141 F.3d 612 (6th Cir. 1998) ..................................................27

*Ok Yeon Yoon v. K-Ltd. Carrier, Ltd.*,
   No. 3:17CV2517, 2020 WL 1031486 (N.D. Ohio March 3, 2020)........................................27

*Rose v. Truck Ctrs., Inc.*,
   611 F. Supp. 2d 745 (N.D. Ohio April 24, 2009) .............................................5, 50

*Rudolph v. Allstate Ins. Co.*,
    No. 2:18-cv-11743, 2020 WL 4530600 (S.D. Ohio August 6, 2020)...................................26

*Sanders v. United States*,
    No. 1:04-cv-00022, 2005 WL 8161515 (S.D. Ohio Oct. 19, 2005) ...............................4, 44

*Scott v. Thomas & King, Inc.*,
    No. 3:09-cv-147, 2010 WL 3603836 (S.D. Ohio Sept. 9, 2010) .....................................27, 44

*In re Welding Fume Prods. Liab. Litig.*,
    No. 1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio 2010)................................................5, 49

*West v. Heimermann*,
    No. 3:20-cv-382, 2022 WL 1719676 (S.D. Ohio May 27, 2022)..........................................50

**Other Authorities**

29 CFR § 1910.120..........................................................................................................20

49 CFR § 171.2 .......................................................................................................2, 39, 42

49 CFR § 171.2(i) ...................................................................................................2, 39, 40

49 CFR § 171.2(b) .........................................................................................1, 12, 31, 43

49 CFR § 171.8 ...........................................................................................................30, 35

49 CFR § 172.204 ...........................................................................................2, 39, 40, 42

49 CFR § 172.204(a)............................................................................................2, 3, 40, 44

49 CFR § 172.204(a)(1)...............................................................................................44

49 CFR § 172.204(a)(3)(ii) ..........................................................................2, 3, 40, 41, 44

49 CFR § 172.704 ....................................................................................................3, 42, 43

49 CFR § 173.31 ..........................................................................................1, 28, 31, 32

49 CFR § 173.31(d)(1)......................................................................................................31

49 CFR § 173.31(d)(1)(ii)...........................................................................................31, 32

49 CFR § 173.31(d)(1)(iii)...........................................................................................31, 32

49 CFR § 173.31(d)(1)(iv)...............................................................................................32

49 CFR § 173.31(d)(2)..................................................................................................32, 33

49 CFR § 180.503 ................................................................................34, 35, 36, 39

49 CFR § 180.509 ............................................................2, 7, 34, 37, 38, 39

49 CFR § 180.509(a)(1)-(4) ................................................................................34

49 CFR § 180.509(k)(2) ................................................................................37, 38

49 CFR § 180.511 ................................................................................7, 38

Federal Rule of Civil Procedure 56(a) ................................................................26

<u>SUMMARY OF ARGUMENT</u>

I.   <u>PLAINTIFF CANNOT ESTABLISH THAT BASF VIOLATED ANY FEDERAL REGULATION</u>

In order to prove negligence in this case, the Court explained that Plaintiff Dalton Merritt ("Plaintiff") must establish that Defendant BASF Corporation ("BASF") violated an applicable Federal Regulation. (Doc. 37 at Page ID # 399). BASF did not violate any applicable Federal Regulation, and thus is entitled to summary judgment.

First, Plaintiff alleges that BASF violated the Hazardous Materials Regulations ("HMRs") because it did not inspect the subject railcar, GATX31085, which was owned by GATX ("Tank Car"). The HMRs provide that there may be more than one offeror of hazardous materials for transportations; that each offeror is responsible only for its specific pre-transportation tasks; and that each offeror may rely on information provided by the other offeror. 49 CFR § 171.2(b). Thus, BASF and its third-party Tank Car loader, non-party IMTT-Geismar ("IMTT"), are "co-offerors" of the Tank Car, which contained toluene diisocyanate ("TDI"), entitling BASF to rely upon IMTT's external visual inspection and testing of the Tank Car. BASF was not required to inspect the Tank Car, because IMTT successfully did so.

Second, Plaintiff alleges that BASF violated 49 CFR § 173.31 relating to inspection of railcar closures and tightening, sealing, and securing closures on the railcar because the Tank Car did not meet the requirements contained therein. This argument fails because IMTT's pre-loading and post-loading inspection and testing of the Tank Car fully complied with the HMRs. IMTT's load checklist that guides its inspections of railcars includes a check of the mechanical components of the Tank Car, among other items required by the HMRs, and was properly filled out and completed for the Tank Car. Additionally, there is no dispute that the Tank Car made its journey from Geismar, Louisiana to Greenfield, Ohio without any identifiable release and the seal

remained intact. Therefore, the Tank Car was properly packaged pursuant to the HMRs.

Third, Plaintiff also alleges that BASF violated 49 CFR § 180.509 by failing to adopt a maintenance and qualification program to recognize unsafe conditions, prevent unsafe conditions from becoming a problem, and ensure the Tank Car met Department of Transportation ("DOT") specifications. The HMRs relating to a "maintenance and qualification program" impose requirements on the Tank Car *owner*, which BASF was *not*. It is undisputed that former defendant GATX was the Tank Car owner. Plaintiff, tacitly acknowledging this, asserts that BASF, as the "service equipment owner," had a responsibility "for the development or adoption of a maintenance and qualification program to ensure that valve and fittings meet a performance specification." However, there is no requirement for a "service equipment owner" to establish a maintenance and qualification program, which is instead the responsibility of the Tank Car owner. Even so, the Tank Car was fully requalified in compliance with the HMRs and DOT specifications.

Fourth, Plaintiff asserts, through his liability experts, Thomas Johnson and Patrick Reilly, that BASF violated 49 CFR § 172.204 and § 171.2 because BASF and its employee, Bill Drum, did not "sign" a "Shipper's Certification." First, BASF certifies its shipments through electronic data interchange ("EDI") transmission, as permitted by 49 CFR § 172.204(a) and 49 CFR § 172.204(a)(3)(ii). That Mr. Drum, the BASF employee whose name appears on the EDI transmission, did not sign the "Shipper's Certification" is irrelevant. BASF complied with its obligations under 49 CFR § 171.2(i) by relying on IMTT's inspection of the Tank Car. Only after fully and properly completing the inspection of a railcar in compliance with the regulations does IMTT input information relating to the inspected railcar into BASF's intranet. BASF then sends the information via EDI to a third-party contractor, QTS, which transmits the EDI directly to the CN railroad. At the time the Tank Car was shipped, Mr. Drum was the Site Logistics Manager at

2

BASF in Geismar. By placing Mr. Drum's name on the EDI transmission, the shipper – BASF – "is also certifying its compliance with the certification…" 49 CFR § 172.204(a)(3)(ii). Guidance from the Pipeline and Hazardous Materials Safety Administration ("PHMSA") also permits BASF to rely upon the information provided by IMTT and consider it "direct knowledge that the materials are in proper condition for transportation." Regardless, the alleged issues with the "Shipper's Certificate" are wholly irrelevant to the causation of the TDI release and Plaintiff's exposure at Adient US, LLC ("Adient"). Plaintiff's employer, Adient, never receives the EDI transmission, nor would it have received any "Shipper's Certificate." Thus, the requirements from the HMRs regarding Mr. Drum's name on the EDI transmission is *not relevant* to causation and played no role in the release of TDI that occurred while Plaintiff unloaded the Tank Car at Adient on March 13, 2019 (the "Incident").

Finally, and in the same vein, Mr. Drum did not have to personally inspect the Tank Car for BASF to certify its compliance with the regulations; thus, BASF did not violate 49 CFR § 172.704 relating to employee training. Pursuant to PHMSA guidance, BASF's reliance upon IMTT's inspection, as a co-offeror of the TDI, is wholly proper and in compliance with Federal Regulations. There is no requirement that the person whose name appears on the EDI transmission, as authorized by 49 CFR § 172.204(a)(3)(ii) as a way to certify a shipment, personally inspect each and every railcar that leaves a third-party loader's facility. When a certification of a shipment is sent via EDI, the signature of the "principal person," in this case, Mr. Drum, certifies BASF's compliance with the certification specified in 49 CFR § 172.204(a).

BASF did not violate any HMR and, regardless, any alleged violation by BASF was not causally related to the Incident. Therefore, Plaintiff cannot establish any basis for his negligence claim, and BASF is entitled to summary judgment.

3

## II.    **PLAINTIFF CANNOT ESTABLISH PROXIMATE CAUSE**

For several reasons, Plaintiff cannot establish proximate cause, and BASF is entitled to judgment as a matter of law. Proximate cause arises "where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act . . ." *Sanders v. United States*, No. 1:04-cv-00022, 2005 WL 8161515, at *2 (S.D. Ohio Oct. 19, 2005) (citation omitted). An intervening cause "breaks the causal chain between negligence and injury" thereby absolving the allegedly negligent actor of liability. *Chapman v. Milford Towing & Serv*., 499 Fed. Appx. 437, 442-443 (6th Cir. 2012). Whether an intervening cause exists is "dependent upon whether the intervening cause was reasonably foreseeable to the one who was initially negligent. The intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury." *Id*. Here, there were multiple intervening, superseding causes of the Incident, including: (1) Adient's failure to continually supply fresh air to Plaintiff during and after the Incident; (2) Adient's failure to provide proper personal protective equipment ("PPE") as required by Federal Regulations, BASF's safety data sheet ("SDS"), and Adient's own training materials; and (3) Plaintiff's own negligence. It was wholly unforeseeable that Adient would ignore the requirements of BASF's SDS, its own training materials, and the Occupational Safety and Health Administration in failing to provide its employees with proper PPE, here, escape air. Additionally, Plaintiff, contrary to his training, used the wrong wrench when unloading the Tank Car and failed to follow Adient's procedure to immediately leave the "hot zone" after the TDI release was stopped.

Further, Adient was a sophisticated user/learned intermediary with respect to the use of TDI, thus discharging BASF of any duty to warn. The sophisticated user defense establishes that "a product manufacturer need not warn members of a trade or profession about dangers generally

known to that trade or profession." *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *103 (N.D. Ohio 2010). Under this defense, a manufacturer can discharge its duty to warn by providing the necessary information to an intermediary upon whom it can reasonably rely to communicate the information to the ultimate user of the product. *Midwest Specialties v. Crown Indus. Prods. Co.*, 940 F. Supp. 1160, 1165 (N.D. Ohio 1996). Adient, Plaintiff's employer, was a sophisticated user and was wholly aware of the dangers of working with TDI. Adient provided training to its employees, including Plaintiff, regarding working with TDI and proper PPE usage. As such, BASF cannot be liable for failure to warn Adient of anything, as Adient was already knowledgeable regarding the dangers of TDI.

## III. PLAINTIFF LACKS ADMISSIBLE EXPERT TESTIMONY NEEDED TO PROVE HIS CLAIM

Finally, Plaintiff lacks admissible expert testimony to establish the essential elements of his negligence claim: breach, causation, and damages. Summary judgment is appropriate where a plaintiff lacks admissible expert testimony required to prove its claim. *See Rose v. Truck Ctrs., Inc.*, 611 F. Supp. 2d 745, 752 (N.D. Ohio April 24, 2009). BASF is contemporaneously moving to exclude the following expert opinions:

- *Plaintiff's liability experts*, Mr. Johnson and Mr. Reilly, because their duplicative opinions are based on unreliable, post-accident inspections of the valve at issue, among other insufficiencies, rendering their opinions in admissible. As such, Plaintiff cannot establish that the valve at issue was "defective" and therefore cannot establish breach or causation.

- *Plaintiff's medical causation expert*, Dr. Ernest Chiodo, because certain of his opinions are not based on sufficient facts or data or reliable principles or methods.

- *Plaintiff's damages experts*, James Lockey, M.D., Kenneth Manges, Ph.D., Harvey Rosen, Ph.D., and Marianne Boeing, because certain of their opinions are based on speculation and lack a sufficient credible factual basis.

Because Plaintiff cannot establish breach, causation, and damages without reliable, admissible expert testimony, his negligence claim fails and BASF is entitled to judgment as a matter of law.

## MEMORANDUM IN SUPPORT

### INTRODUCTION

This action arises out of a chemical release that occurred on March 13, 2019 whereby Plaintiff was exposed to TDI while unloading a railcar at his then-employer, Adient, after his PPE failed. BASF, manufacturer of the TDI, is the only remaining defendant[1] in this action with one claim surviving against it: negligence.[2]  This Court previously laid out that the only way for Plaintiff to succeed on his negligence claim is to establish that BASF violated a specific applicable Federal Regulation. Plaintiff cannot do so as BASF fully complied will all Federal Regulations applicable to it. In addition, Adient's failure to continually supply fresh air to Plaintiff, Adient's failure to provide proper PPE as required by Federal Regulations, BASF's safety data sheet, and its own training materials, and Plaintiff's own negligence during the release are all intervening, superseding causes that absolve BASF of liability. Further, Adient was a sophisticated user/learned intermediary with respect to the use of TDI and Plaintiff was trained on the dangers of working with TDI and proper PPE usage, thus discharging BASF of any duty to warn of the dangers of working with TDI. Finally, Plaintiff lacks reliable expert testimony necessary to prove his negligence claim.[3]

Therefore, BASF is entitled to judgment as a matter of law, and the Court should grant BASF's Motion for Summary Judgment.

---

[1] Plaintiff also brought claims against Illinois Central Railroad Company d/b/a CN and GATX Corporation ("GATX") subsequently dismissed both, with prejudice, on June 4, 2021 and March 4, 2025, respectively. (Doc. 27; Doc. 106).

[2] The Court granted in part and denied in part BASF's Motion to Dismiss (Doc. 37 at Page ID # 387-401), dismissing Plaintiff's negligence per se claims because, under Ohio law, violations of administrative codes do not give rise to valid, cognizable negligence per se claims. (*Id*. at Page ID # 398).

[3] BASF is contemporaneously moving to exclude certain opinions offered by Plaintiff's liability and damages experts.

## FACTUAL BACKGROUND

### I. RAIL TANK CAR GATX31085

The Tank Car was owned by former defendant GATX and was initially leased to BASF in 1982 pursuant to a master lease. (Proposed Undisputed Facts, attached hereto, "PUF," ¶ 1). Pursuant to the master lease between GATX and BASF, GATX was responsible for keeping "each car maintained in accordance with the AAR Rules and the rules and regulations of the U.S. Department of Transportation and of any other federal authorities..." (*Id.* ¶ 2). The Tank Car was last "shopped" by GATX for its federally required 10-year inspection at the GATX facility in Hearn, Texas in January to March 2016, during which the Tank Car was fully inspected, and GATX installed the top load valve at issue (the "Subject Valve"). (*Id.* ¶ 3). The Tank Car was "qualified for use" at that time pursuant to 49 CFR § 180.509 by passing all tests and inspections set forth in 49 CFR § 180.511 in 2016. (*Id.* ¶ 4). Next, in October 2018, the pressure relief valve on the Tank Car, which is wholly different than the Subject Valve, was tested and replaced by GATX. (*Id.* ¶ 5). At that time, the Subject Valve passed the GATX "leakage pressure test." (*Id.* ¶ 6). In addition, there were no identified issues with the Subject Valve's handle or any noted buildup of product. (*Id.* ¶ 7).

From 2016 through 2019 the Tank Car, while in service, underwent multiple "touch up paintings" that IMTT employees testified were necessary due to TDI customers leaking drips of product when detaching the unloading hose or to paint over graffiti. (*Id.* ¶ 8). The "touch up paintings," done by GATX at IMTT's Geismar, Louisiana facility after the Tank Car was loaded, had nothing to do with valve integrity. (*Id.* ¶ 9). Indeed, the need for such "touch up painting" on this Tank Car was not an indication of a leaking or defective valve. (*Id.* ¶ 10).

GATX also conducted "visual walk-around inspection[s]" of the railcars at BASF's Geismar facility pursuant to an agreement with BASF. (*Id.* ¶ 11). GATX also inspected the Tank

Car when it performed touch up painting. (*Id*. ¶ 12). No issue was identified by GATX on the Tank

Car on February 19, 2019, when it was inspected prior to the touch up painting. (*Id*. ¶ 13).

## II.    TANK CAR LOADING BY IMTT[4]

In December 2005, BASF contracted with IMTT to "develop, construct and operate the

"GLC" ("Services Agreement"), which included IMTT's responsibilities for loading railcars at its

Geismar facility with various chemicals produced by BASF. (*Id*. ¶ 14). GLC is defined in the

Services Agreement as:

> all physical assets necessary or useful in the operation of a public logistics facility,
> or otherwise located on land and personalty that is being sold, leased or otherwise
> provided to [IMTT] in connection with this transaction as well as on land and/or
> personalty acquired from third parties. Without limiting the generality of the
> foregoing, the GLC will include all storage tanks, Drum filling equipment and
> facilities, warehouses, truck and rail filling stations, and jetties located on or
> adjacent to such land, and all associated facilities and appurtenances.

(*Id*. ¶ 15). The Services Agreement also delineates the responsibilities of BASF and IMTT:

> As BASF is relying upon [IMTT]'s skills and experience in the performance of the
> Services under this Services Agreement, [IMTT] alone will be responsible for
> supervising its personnel.

(*Id*. ¶ 16). Finally, the Services Agreement explains that IMTT is an independent contractor:

> Nothing contained in this Services Agreement will be construed to make either
> [IMTT] or BASF partners, joint venturers, principals, agents, or employees of the
> other. Neither Party will have any right, power, or authority, express or implied, to
> bind the other Party.

(*Id*. ¶ 17). Indeed, IMTT understood in 2019 that IMTT was ***not*** an agent of BASF pursuant to the

Services Agreement and that BASF relied upon IMTT for its expertise to ensure railcars were

properly loaded and safe for transportation. (*Id*. ¶ 18). As of 2019, IMTT provided its employees

with safety training and instruction on proper loading of TDI railcars and the PPE to be worn and

---

[4] In June of 2023, Plaintiff requested additional time to determine whether to add IMTT as a party but
elected not to do so. (Doc. 45 at Page ID # 452).

was responsible for providing its employees with proper PPE to load TDI railcars. (*Id*. ¶ 19[5]). BASF employees were not present when IMTT loaded TDI railcars at its facility; nor did BASF control IMTT's inspection process. (*Id*. ¶ 21).

Importantly, pursuant to the Services Agreement, IMTT expressly agreed to perform its obligations in compliance "with all laws, rules, regulations, ordinances, codes, orders (judicial or administrative) and decrees of any entity having jurisdiction…" (*Id*. ¶ 22). Namely, IMTT was required to carry out its duties in compliance with the HMRs, which were developed and promulgated by PHMSA, an agency of the DOT. (*Id*. ¶ 23) ("It's [IMTT's] responsibility to make sure those railcars are load[ed] according to those regulations.").

In short, the specific product (here, TDI) was piped from BASF's Geismar plant to the IMTT Geismar facility's storage tanks, and IMTT employees solely inspected and loaded the railcars for delivery to the railroad. (*Id*. ¶ 24). This railcar loading process was dictated through use of the IMTT formulated and generated TDI Checklist/Inspection Report, or the "IMTT load checklist," which was filled out by the IMTT loaders responsible for loading TDI railcars. (*Id*. ¶ 25). The IMTT load checklist filled out for the Tank Car on February 19, 2019 is below:

---

[5] IMTT's required PPE in 2019 for loaders of TDI railcars included a chemical apron, nitrile gloves, fresh air supply via hose, and an escape air pack. (PUF, ¶ 20).

**IMTT-Geismar**
TDI Railcar Checklist / Inspection Report

Date: 2-19-19   Rail Car #: GATX 31085

Product: TDI
Rebrand: N/A
PSV Due Date: 2028
Gauge (inches):
Seal #'s: 360209?, 98
Bag Seal #'s: 94, 700

Source Tank: 1307
Maximum Load Limit: 196,900
Tank Test Due Date: 2026

**SAFETY, HEALTH, PPE**

Appearance and Odor    Clear liquid. Strong, pungent odor.

Most Imminent Hazards    WARNING: Poison. Harmful if inhaled. Sensitization can occur in some individuals, leading to asthma-like spasms of the bronchial tubes and difficulty in breathing.

First Aid:    Inhalation: Remove to fresh air. Aid in breathing. Seek immediate medical attention.
Eyes: Immediately flush with fresh water for 15 minutes. See immediate medical attention.
Skin: Wash affected areas thoroughly with soap & water. See immediate medical attention.
Ingestion: DO NOT INDUCE VOMITING. Rinse mouth immediately. Drink plenty of water. See immediate medical attention.

Standard PPE:    Safety Glasses w/ Side Shields, Hard Hat/Goggles, Protective Boots, Uniform

PPE REQUIRED
This includes inspection of railcar, connecting/disconnecting of process piping, opening and closing valves, taking samples, loading and unloading.

| Respiratory Protection | Supplied air. | | |
|---|---|---|---|
| Boots | Name | Gloves | Barrier or Nitrile |
| Face Shield | N/A | Apron | CPF 3 |
| Goggles | N/A | Chemical Suit | CPF 3 |

Comments:  For any items marked NO, give detailed description and notify Supervisor.

| THIS SECTION TO BE COMPLETED BEFORE CAR IS LOADED | Operator Initial YES | NO |
|---|---|---|
| 1. Verified blue flag caution signs are in place on load rack. | CJ | |
| 2. Ensured that at least one car in the string is chocked and brake is set. | CJ | |
| 3. Connected ground cable. | CJ | |
| 4. Verified that pump order matches checklist information. | CJ | |
| 5. Verified that car is a TDI car. Ensure car has readable "2078" Placards. | CJ | |
| 6. Verified that railcar stencil is legible. | CJ | |
| 7. Verified railcar DOT stencil is 111A100W1. If DOT stencil does not match, contact Supervisor immediately. DOT Stencil: | 111A100W1 | CJ |
| 8. Is car stenciled "TOLUENE DIISOCYANATE" (BASF car). Re-stencil if necessary. | CJ | |
| 9. Verified that car exterior is clean and is acceptable for loading. | CJ | |
| 10. Has car passed RR inspection (no defect cards)? All safety devices OK? | CJ | |
| 11. Are steam coil inlet and outlet threads OK? | CJ | |
| 12. Lowered fall protection and began top inspection. | CJ | |

**IMTT-Geismar**
TDI Railcar Checklist / Inspection Report

Date: 2-19-19   Rail Car #: GATX 31085

| THIS SECTION TO BE COMPLETED BEFORE CAR IS LOADED | Operator Initial YES | NO |
|---|---|---|
| 13. Is car mechanically loaded for loading? Inspected the shell of car, including walks, cradle, bolster, ladders, platforms, handrails, wheels, springs, brake shoes % assembly, graffiti, paint, puncture, dents, rust, plugs, and chains. List any defects in comment section. | CJ | |
| 14. Checked returning seals to make sure they are BASF or Customer seals and are in place. | CJ | |
| 15. Are plugs, levers, seal pins, and chains in place and in good condition and working properly on top and bottom and on housing? | CJ | |

| WITH PRESSURE ON CAR, CHECK THE FOLLOWING: | Operator Initial YES | NO |
|---|---|---|
| 1. Hooked up vent and Hi Level probe to vent valve on car. | CJ | |
| 2. Opened vent valve on car and recorded nitrogen pressure ____ 10 psi | CJ | |
| 3. Slowly opened vent valve on rack and depressurize rail car to carbon bed. | CJ | |

| WITH CAR DEPRESSURIZED, CHECK THE FOLLOWING: | Operator Initial YES | NO |
|---|---|---|
| 1. Do all valves in protective housing cover operate properly and easily? | CJ | |
| 2. Is there a heel in car? If heel is greater then 3 feet wide or appearance is not TDI, STOP AND NOTIFY SUPERVISOR. (Note details in comment section.) | | CJ |
| 3. If answer to #2 above is yes, is heel a clear obvious appearance of TDI? | | CJ |
| 4. If answer to #2 above is yes, is foreign material present in heel? | | CJ |
| 5. If heel is greater than 1 foot wide, get image and report to ATM. Image _____ | | CJ |
| 6. Install fitting for closed dome loading and hook up loading hose to fitting. | CJ | |
| 7. Securely locked down loading arms with chains. | CJ | |
| 8. Aligned regulated nitrogen valving and pressured up arm and load hose to ensure no leakage. | CJ | |
| 9. Opened 2" induction valve and blew nitrogen through loading arm into car to ensure induction tube is clean. | CJ | |
| 10. Align manual valves for loading. | CJ | |
| 11. Load according to railcar loading console procedure. | CJ | |

| THIS SECTION TO BE COMPLETED AFTER CAR IS LOADED | Operator Initial YES | NO |
|---|---|---|
| 1. When loading completed, blocked loading arm valve, purged loading arm with nitrogen into car for a minimum of 5 minutes. | CJ | |
| 2. Blocked induction valve, disconnected arm, capped arm and secured at rack. | CJ | |
| 3. Closed and securely fastened manway using ½" impact wrench. | CJ | |
| 4. Removed level probe from 1" vent valve and installed cap on fitting. | CJ | |
| 5. Placed positive nitrogen pad pressure on car. Blocked 1" vent valve (30 psi). Blocked 1" vent valve. | CJ | |
| 6. Depressured vent hose to Carbon Bed. | CJ | |
| 7. Disconnected vent hose and secured at rack. | CJ | |
| 8. Lock checked manway, all fittings, and relief valve with Zep. Departure pressure: 30 psi | CJ | |
| 9. Picture taken inside of induction valve showing no build-up of product. Ensure identification of car is in picture using product tag listing car number. | CJ | |
| 10. Packed 2" induction valve with Vaseline. | CJ | |

**IMTT-Geismar**
TDI Railcar Checklist / Inspection Report

Date: 2-19-19   Rail Car #: GATX 31085

| THIS SECTION TO BE COMPLETED AFTER CAR IS LOADED | Operator Initial YES | NO |
|---|---|---|
| 11. Pictures taken of open protective housing cover and 2" induction valve packed with Vaseline. Ensure identification of car is in picture using product tag listing car number. | CJ | |
| 12. Cleaned the 2" and 1" plug threads with wire brush and then lubricated threads with Vaseline. | CJ | |
| 13. Installed plugs in 2" induction valve and 1" vent valve. Tightened plugs "wrench tight" by using an 18-inch pipe wrench. It is also necessary to be sure that the load and vent valves are "wrench tight" by checking them with an 18-inch wrench pipe. | CJ | |
| 14. Painted protective housing cover and area surrounding protective housing cover – REQUIRED ON ALL TDI CARS | CJ | |
| 15. Verified seals and product tags match checklist information. | CJ | |
| 16. Pictures taken of open protective housing cover and sealed manway after attaching seals including product tag and nitrogen tag. Ensure identification of car is in picture using product tag listing car number. | CJ | |
| 17. Inserted return seals with memo into mini-dome (enter numbers above). | CJ | |
| 18. Attached seals, including product and nitrogen warning tags, on protective housing cover. | CJ | |
| 19. Pictures taken of closed and sealed protective housing cover and sealed manway. Ensure identification of car is in picture using product tag listing car number. | CJ | |
| 20. Lifted and secured fall protection. | CJ | |
| 21. Did GATX have to come out and paint stains on exterior of car? | CJ | |
| 22. If GATX painted car, what car or required painting? Sides / Top | CJ | |
| 23. Picture taken of side of car including of railcar number. | CJ | |
| 24. Remove ground, chocks, and blue flag caution signs. | CJ | |

Operator   Name (Print) Cordell Johnson   Signature Cordell Johnson   Date 2-19-19

| THIS SECTION TO BE DOUBLE-CHECKED BY ANOTHER LOADER, OPERATOR, OR SUPERVISOR AFTER CAR IS LOADED | Operator Initial YES | NO |
|---|---|---|
| 1. Checked manway seals with Torque wrench. | | |
| 2. Checked tightness of 2" and 1" plugs "wrench tight" by using an 18-inch pipe wrench. | | |
| 3. Verified seals and product tags match checklist information. | | |

Operator   Name (Print) _____   Signature _____   Date 2-19-19
Supervisor

(*Id.* ¶ 26). IMTT's inspection included, but was not limited to, conducting a preload pressure check to ensure no valves were leaking or defective before the Tank Car was loaded with TDI. (*Id.* ¶ 27).

Should a railcar fail the preload pressure check or should a valve be found to not be working properly, the loader could not proceed with the loading process and IMTT notified the railcar owner (here, GATX) to conduct any needed repair. (*Id.* ¶ 28). A post-load pressure check was also performed on the load valves under thirty pounds of pressure to ensure no leaking or bubbling, which would signal a defective valve. (*Id.* ¶ 29). This post-load pressure check was part of the IMTT load checklist, which specified that this check was to be done after a railcar was loaded. (*Id.* ¶ 30). IMTT took photographs of the valves ***after*** its post-load pressure check but before the plug was placed in the top load valve to memorialize the validity of its test, such as the one below of the Tank Car:



(*Id.* ¶ 31). If the IMTT inspection and testing was completed successfully and signed off on, the railcar met the requirements of the federal regulatory guidelines. (*Id.* ¶ 32).

Once the railcar was properly loaded and inspected and the IMTT load checklist was completed, IMTT "board operators" confirmed the volume that was loaded on the railcar. (*Id.* ¶ 33). IMTT then sent the information relating to a particular railcar loaded for a particular customer to BASF via EDI into BASF's SAP system. (*Id.* ¶ 34). IMTT would not enter any data into BASF's SAP system if the tank car was not in proper/safe condition for transportation according to

applicable Federal Regulations. (*Id.* ¶ 35). BASF then sent the information via EDI to a third-party contractor, QTS, which then transmitted the EDI directly to the CN railroad. (*Id.* ¶ 36).

BASF and IMTT are considered "co-offerors" of the shipment of TDI pursuant to the Federal Regulations. (*Id.* ¶ 37). The Federal Regulations allow there to be more than one offeror, with each offeror responsible for its specific pre-transportation functions. 49 CFR § 171.2(b); (*Id.* ¶ 38). As a co-offeror of TDI, BASF was entitled to rely upon IMTT's inspection of the railcars pursuant to applicable Federal Regulations. 49 CFR § 171.2(b). (*Id.* ¶ 39). PHMSA guidance also confirms that BASF's reliance upon the inspection performed by IMTT, as a co-offeror of the TDI, was wholly proper and in compliance with Federal Regulations. (*Id.* ¶ 40). Pursuant to PHMSA guidance, BASF was "not required to perform the physical inspection of the cars" because IMTT "physically inspected the cars" while BASF "prepared the shipping documentation." (*Id.* ¶ 41).

## III. <u>THE SUBJECT TANK CAR LOADING AND INSPECTION</u>

On February 19, 2019, the day the Tank Car was loaded by IMTT, prior to its departure to Adient, IMTT completed its load checklist inspection and testing, which satisfied applicable Federal Regulations. (*Id.* ¶ 42). Brad Gremillion, the IMTT employee who doubled-checked the Tank Car's Subject Valve on this day testified that he observed no issues with any valve; if he had, he would have notified his supervisor, (*Id.* ¶ 43), which he did not. (*Id.*). He verified that, during his double-check, he did not observe anything wrong with the valves that would cause him to reject the Tank Car. (*Id.* ¶ 44). Gremillion testified that his double-check also included checking the torque or tightness of bolts and plugs and a visual inspection of the Subject Valve itself. (*Id.* ¶ 45). Plaintiff's expert, Thomas Johnson, admitted that tool tightness of the plug was checked by IMTT by two separate employees, as required by the Federal Regulations. (*Id.* ¶ 46). As a co-offeror with BASF of the TDI, IMTT was responsible for its specific pre-transportation functions that it agreed to perform, including its external visual inspections. (*Id.* ¶ 47).

12

IMTT's load checklist and inspection report were fully completed on February 19, 2019. (*Id*. ¶ 48). IMTT also took photographs of the valves after loading, passing the post-load pressure test, and prior to departure, including photographs of the Subject Valve showing: (1) the Subject Valve without a plug in it (*supra*, p. 11); (2) the Subject Valve with Vaseline in it to ensure the Subject Valve would operate easily; and (3) the Subject Valve with the plug inserted:



(*Id*. ¶ 49).

GATX also completed its visual inspection of the Tank Car that day, and there is no evidence that GATX identified any issues with the Tank Car. (*Id*. ¶ 50). When the Tank Car was picked up at IMTT by Canadian National Railroad, the railroad also inspected the car to ensure that it was safe for transportation, and it found the Tank Car was safe for transportation. (*Id*. ¶ 51). Indeed, the Tank Car completed its journey from Louisiana to Ohio without any identifiable release of TDI and with its closures in a tool-tight condition. (*Id*. ¶ 52).

## IV. BASF'S TDI CUSTOMER – ADIENT

As of 2019, Adient at its Greenfield facility had long used TDI in the manufacturing process of foam seats for automobiles. (*Id*. ¶ 53). Adient employees who unloaded railcars were trained regarding safety protocols for working with or around TDI and PPE usage in annual

13

HAZWOPER training.[6] (*Id*. ¶ 54). In addition, the SDSs from the TDI manufacturer, such as BASF, were available in hard copy for all employees in the breakroom and the tank farm. (*Id*. ¶ 55). Adient was aware of the steps that needed to be taken to protect its employees from the dangers of TDI and ensured its employees were aware of "the level of hazard" of TDI. (*Id*. ¶ 56). Adient testified that it was a "sophisticated user" of TDI and was fully aware of the hazards and dangers of working with TDI. (*Id*. ¶ 57).

Plaintiff was personally trained in the safe procedures for unloading TDI railcars for approximately six months in 2014. (*Id*. ¶ 58). Plaintiff received safety training on the hazards of working with TDI and proper PPE usage. (*Id*. ¶ 59). Plaintiff's training as a chemical process technician began with Plaintiff observing his trainer performing the tasks, then gradually completing tasks on his own. (*Id*. ¶ 60). Plaintiff was trained to open the dome lid on the railcar to access the valves, visually inspect the valve for residue, and "check[] the position of the handle." (*Id*. ¶ 61). Plaintiff was trained by Trefz to use a pipe wrench to remove the load valve plug (which necessitates bending down near the Subject Valve's valve stem and handle making them easier to observe); but instead, in violation of his training, chose to use a 3-foot long t-handled wrench ("long t-wrench") the day of the Incident. (*Id*. ¶ 62). Plaintiff stated he only "sometimes" used a pipe wrench, which would require him to get on his knees and look at the valve stem. (*Id*. ¶ 63). Plaintiff's use of a long t-wrench, as opposed to a pipe wrench, on the day of the Incident explains why he only observed the Subject Valve's valve handle from "six feet away" and never bent down to look at the valve handle or the valve stem to see if it was out of position. (*Id*. ¶ 64).

---

[6] HAZWOPER is OSHA's Hazardous Waste and Emergency Response standard.

## V.     **THE INCIDENT**

The Incident at the center of this litigation is a TDI release at Adient that occurred on March 13, 2019. (*Id.* ¶ 65). At the time of the Incident, Plaintiff was working as a chemical process technician at Adient's Greenfield, Ohio facility. (*Id.* ¶ 66). In his role as a chemical process technician, Plaintiff's duties included unloading tank trunks and railcars that carried chemicals for use in Adient's manufacturing process of making automotive car seats. (*Id.* ¶ 67).

When Adient received a railcar, an Adient employee, like Plaintiff, ordered the railcar to be taken from the railyard onto the plant property where it was placed to be unloaded. (*Id.* ¶ 68). Plaintiff testified that "some day before" the date of the Incident, he had unlocked the dome on the Tank Car and checked the temperature of the TDI in the Tank Car. (*Id.* ¶ 69). From the time he unlocked the Tank Car dome to the time he went to unload the Tank Car on the day of the Incident, the Tank Car sat unattended with an unsecured dome. (*Id.* ¶ 70).

The Incident occurred around 8 a.m. at Adient's railcar unloading rack. (*Id.* ¶ 71). At the time, Plaintiff was wearing what he described as a "Level B" air-supplied hood, chemical boots, overalls, and gloves supplied by Adient. (*Id.* ¶ 72). A hose that hooked to the backside of his hood supplied positive fresh air pressure to keep any fumes out and was connected to the fresh air system inside of the plant. (*Id.* ¶ 73).

Plaintiff then began the offloading process for the Tank Car. (*Id.* ¶ 74). After completing various tasks, Plaintiff testified that he took his tools – including the long t-wrench – to the top of the Tank Car. (*Id.* ¶ 75). While on top of the Tank Car, Plaintiff, who is six feet and five inches tall, visually observed the Subject Valve from six feet away (by looking down at it) while wearing his PPE hood and observed that there was no indication of any leaks and that the valves were in the "closed" position. (*Id.* ¶ 76). He noticed no damage to the Subject Valve's valve handle, but never observed the valve stem. (*Id.* ¶ 77). It is important to visually inspect the valve stem prior to

removing the plug to ensure that the valve stem is in the "closed" position, perpendicular to the flow of product. (*Id*. ¶ 78). Plaintiff also testified that he did not see any product on the surface of Tank Car and that the Tank Car was properly placarded. (*Id*. ¶ 79).

Standing above the Subject Valve, using the long t-wrench, Plaintiff testified that he turned the plug in the Subject Valve "one and half to two and a half turns," and, at that point, product "began spewing everywhere." (*Id*. ¶ 80). After attempting and failing to close the plug with the long t-wrench, Plaintiff testified that he then got on his knees and tried to push the valve handle down, which led to him receiving "a surge of product" onto his "respirator hood" and onto his face shield. (*Id*. ¶ 81). Plaintiff was able to stop the release of TDI by manipulating the valve handle. (*Id*. ¶ 82). Photographs of the Subject Valve, taken shortly after the Incident, depict the Subject Valve in the proper closed position (which is where a proper inspection would have noted it), with the valve stem perpendicular to the flow of product, but covered in neutralized TDI (which turns to hardened urea):



(*Id*. ¶ 83).

After stopping the release and activating the chemical alarm, Plaintiff used the decontamination shower on ground level, using "copious" amounts of water, as circled in the photo below:



(*Id*. ¶ 84, circle added). At that point, his supplied air via hose attached to his hood was functioning

properly. (*Id*. ¶ 85). Plaintiff then went back to the top of the Tank Car to secure the Subject Valve

by putting the plug in and tightening the plug with the long t-wrench, as shown in the photo below:



(*Id*. ¶ 86). Afterward, he sprayed himself with neutralizer that had been provided by plant

personnel, which he also rinsed off in the decontamination shower. (*Id*. ¶ 87).

After showering, Plaintiff's plant air supply unexpectedly shut off. (*Id*. ¶ 88). According to

Plaintiff, "[w]hen you lose your positive pressure, there's – you know, you lose your safety barrier

essentially." (*Id*. ¶ 89). He began inhaling TDI fumes. (*Id*. ¶ 90). His air supply briefly turned back

on but was cut off again. (*Id*. ¶ 91). Plaintiff explained that he banged on the plant door and yelled

for his air to be turned back on, to no avail. (*Id*. ¶ 92). Plaintiff testified that he then opened the

door to the plant, pulled off his hood, and yelled into the plant "I need air out here. I can't breathe."

(*Id*. ¶ 93). When his air supply remained turned off, he decided, now breathing TDI fumes, to "save

his own life and self-rescue himself." (*Id*. ¶ 94). Plaintiff testified that it came as a "complete

surprise" that his air was cut off as it had never happened before. (*Id*. ¶ 95).

Plaintiff, with no plant supplied fresh air, stretched his non-functioning air hose as far as

possible to the other side of the railroad tracks, which was still in the "hot zone" of TDI in the air.

(*Id*. ¶ 96). Plaintiff explained that the connected air hose was long enough to allow the user to get

inside the plant, but he would not have been able to close the door all the way or get away from

fumes during a release. (*Id*. ¶ 97). After stretching his non-functioning air hose as far as it could

go, he took a deep breath (breathing fumes), held his breath and disconnected. (*Id*. ¶ 98). He then

took off his hood, gloves, and suit and ran. (*Id*. ¶ 99). He then stood in "the warm zone" until first

responders arrived to decontaminate him. (*Id*. ¶ 100).

## VI.    <u>INCIDENT INVESTIGATION BY ADIENT</u>

Josh Postell, Adient Process Manager, and Joseph Jones, Adient's Environmental

Manager, both participated in Adient's investigation of the Incident and Adient's 8D Problem

Analysis Report, which identified the root causes of Plaintiff's exposure. (*Id*. ¶ 101). The root

causes of the exposure were described by Adient as follows:

- ▪ Employee did not leave area immediately after release was stopped.
- ▪ Team members was [*sic*] trying to contact [*sic*] a hose that did not have
  correct fitting.

18

- ▪ Valves on ENMET[7] system are not labeled.
- ▪ Employee did not contact assistance to be present when connecting to railcar…

(*Id*. ¶ 102). Both Mr. Jones and Mr. Postell confirmed that Plaintiff's air supply was cut off due to confusion on the part of Adient personnel as to the correct connection for Plaintiff's air supply hose. (*Id*. ¶ 104). Mr. Postell agreed that this occurrence was "unexpected and unanticipated." (*Id*. ¶ 105). Indeed, there had never been a TDI railcar leak or release at Adient's Greenfield facility before. (*Id*. ¶ 106). Mr. Jones also explained that all Adient employees who unload railcars are trained to fill out its "TDI Unload Checklist," which Plaintiff openly admitted that he did not do. (*Id*. ¶ 107). Mr. Postell explained that it was determined that a second person should have been present when connecting and disconnecting equipment, but Plaintiff also failed to follow this Adient procedure. (*Id*. ¶ 108). Mr. Jones also confirmed that, according to Adient's procedure, Plaintiff should have immediately evacuated the area, instead of spraying himself with neutralizer and attempting to clean up, as that is "not [Adient's] procedure." (*Id*. ¶ 109). He also testified that had Plaintiff left the area as he was trained to, he would have avoided inhaling any chemical fumes. (*Id*. ¶ 110).

Although it was Adient's responsibility to supply PPE to its employees, Adient failed to do so here. (*Id*. ¶ 111). BASF's SDS for TDI, provided to Adient and used in Adient's training with respect to TDI, requires use of a "NIOSH-certified full facepiece pressure demand self-contained breathing apparatus (SCBA) *or* a full facepiece pressure demand supplied-air respirator (SAR) *with escape provisions*." (*Id*. ¶ 112). Occupational Safety and Health Administration ("OSHA") guidance required the same "[p]ositive pressure, full-facepiece self-contained breathing

---

[7] "ENMET" is the fresh air supply system connecting Plaintiff's hood to the fresh air supply in plant via hose. (PUF, ¶ 103).

apparatus (SCBA), or positive pressure supplied air respirator ***with escape SCBA*** (NIOSH approved)" (Appendix B to 29 CFR § 1910.120 Part A) (emphasis added), and Adient's own HAZWOPER training required the same escape air to be provided. (*Id.* ¶ 113). [8]



181

(*Id.*, circle added). Plaintiff admits that he knew what "escape air" was from his firefighting training, but that he was not provided an "escape air" bottle by Adient; nor did he receive any training by Adient on using escape air (other than what was in the HAZWOPER training slides). (*Id.* ¶ 115).[9] In fact, contrary to OSHA regulations, Adient's HAZWOPER training, and BASF's SDS, Adient did not provide escape air to employees unloading TDI railcars. (*Id.* ¶ 117).

## VII.   POST-INCIDENT SUBJECT VALVE INSPECTION AND TESTING

Months after the Incident, multiple inspections were performed on the Subject Valve.

---

[8] This is the same escape air provisions that IMTT TDI railcar loaders wear on a daily basis, in case something happens with the plant air. (PUF, ¶ 114).

[9] The purpose of the escape air bottle is to provide about five minutes of clean air in case the plant air supply gets interrupted, as here, in the event of a spill or release (PUF, ¶ 116).

James Kennedy, the GATX employee who drafted GATX's Summary of Findings dated June 4, 2019, inspected the Subject Valve months after the Incident and testified that his testing only was done post-Incident and that, as of the time of the Incident, he "can't answer the condition [the valve] was in; but only the received condition when [he] got the valve." (*Id*. ¶ 118).  He admitted that because he was "not there when the car was loaded," it was *not* fair to conclude that the issues identified in his report "existed when the car was loaded." (*Id*. ¶ 119). He testified that he could not move the ball valve handle when he received the Subject Valve in June 2019 because of the buildup of hardened product; the Subject Valve was steam-cleaned, but a large amount of urea remained on and in the Subject Valve. (*Id*. ¶ 120).[10] The large amount of remaining urea, which is yellow in color, can be seen in photos taken during the GATX inspection:



(*Id*. ¶ 123).

In its Concern 8D Report dated June 14, 2019, BASF, which relied upon the GATX report, identified the "root cause" of the TDI release as follows: "the valve handle, stop and innerworkings were compromised." (*Id*. ¶ 124). One of the authors, Joe Dawson, testified that he did not know the condition of the Subject Valve pre-release. (*Id*. ¶ 125). Mr. Dawson also testified that the

---

[10] The Subject Valve's handle was "frozen" in the open position, despite post-Incident photos of the Subject Valve in the closed position. (PUF, ¶ 121). The Subject Valve was kept by third-party, Enviroserve, for months until it was shipped to BASF near the end of May 2019. (PUF, ¶ 122).

Subject Valve had "quite a bite of residue" on it and that he did not know "the condition the valve was in at the customer." (*Id*. ¶ 126).

Plaintiff's railroad engineering expert, Thomas Johnson,[11] also conducted testing in May 2024 on the Subject Valve and concluded that the Subject Valve was "defective." (*Id*. ¶ 127). Johnson admitted that he performed his testing *after* the Incident and after there was still product buildup on <u>and</u> in the Subject Valve. (*Id*. ¶ 128). He also admitted that he has no evidence that the Subject Valve "leaked TDI product after it was loaded" on the date of the Incident or in February 2019 when the Tank car was loaded. (*Id*. ¶ 129).

Notably, BASF's expert, Dr. Eric Guyer, who specializes in failure analysis and metallurgy, concluded that:

> The condition of the Subject Valve *changed* because of the incident; conclusions and observations regarding the condition of the valve based on inspections conducted *post-incident are unreliable indicators* as to the condition and operability of the valve prior to the incident.

(*Id*. ¶ 130) (emphasis added). As Dr. Guyer explained:

> [T]he incident itself altered the condition of the valve, and the valve condition further changed due to cleaning and disassembly after the incident (before any experts, including myself or Plaintiff's experts, had the opportunity to examine it).

(*Id*. ¶ 131). Dr. Guyer explained the inability to seal the Subject Valve during the May 2024 inspection is not representative[12] of the Subject Valve's condition when it left IMTT on February

---

[11] BASF is contemporaneously moving to exclude opinions offered by Plaintiff's expert, Thomas Johnson.

[12] Further, Dr. Guyer stated that during GATX's inspection the handle was removed from the Subject Valve and was subsequently reinstalled on the Subject Valve, but there is no indication that the handle was tightened down to the recommended torque. (PUF, ¶ 133). Additionally, hardened commodity was observed on the exterior and within the interior of the Subject Valve, even following steam cleaning. (*Id*. ¶ 134). As such, GATX's inspection report is unreliable as to the condition of the Subject Valve at the time of the Incident. (*Id*. ¶ 135).

19, 2019 because the inspection itself damaged the valve body, causing the Subject Valve to no longer be able to seal properly. (*Id*. ¶ 132).

## VIII.  **PLAINTIFF'S ALLEGED INJURIES AND DAMAGES**

BASF has moved contemporaneously to exclude the opinions of each expert proffered by Plaintiff in support of his damages calculation: (1) Ernest Chiodo, M.D.; (2) James Lockey, M.D.; (3) Kenneth Manges, Ph.D.; (4) Marianne Boeing; and (5) Harvey Rosen, Ph.D. A brief summary of each expert's findings, opinions and their respective shortcomings is warranted here.

Plaintiff's medical causation expert, Dr. Chiodo,[13] opines that Plaintiff's exposure to TDI caused Plaintiff to contract "both Reactive Airways Dysfunction Syndrome ("RADS") as well as allergic sensitization to TDI." (*Id*. ¶ 136). However, Dr. Chiodo never performed a dose reconstruction to model the amount of TDI to which Plaintiff was exposed and merely assumes that Plaintiff was exposed to an amount capable of causing RADS. (*Id*. ¶ 137). In fact, Dr. Chiodo never examined Plaintiff, and only spoke with him remotely via Zoom. (*Id*. ¶ 138). A pulmonologist who actually examined Plaintiff in 2019 and has authored peer-reviewed articles on RADS,[14] Dr. Lockey, opined that Plaintiff does *not* have RADS, but rather mild occupational asthma. (*Id*. ¶ 139).

Further, the evidence is unrebutted that Plaintiff was obese at the time of the Incident in 2019; his treating health care provider listed his weigh as 350 pounds in March 2019. (*Id*. ¶ 140). Dr. Lockey, in his contemporaneous records, recommended a "weight reduction program" through "diet and exercise" when he saw Plaintiff in 2019. (*Id*. ¶ 141). Now, for purposes of this litigation in 2024, Dr. Lockey discussed with Plaintiff's life care planning expert, Marianne Boeing, that

---

[13] BASF is contemporaneously moving to exclude the opinions of Dr. Ernest Chiodo, as his opinions are unreliable.

[14] Dr. Lockey's research directory is publicly available at https://researchdirectory.uc.edu/p/lockeyje.

Plaintiff could benefit from use of a prescription weight loss medication for a few months (despite no treating physician even prescribing the medication). (*Id*. ¶ 142). Even so, Dr. Lockey openly admits that Plaintiff was morbidly obese *prior to* the Incident in 2019. (*Id*. ¶ 143).

Similarly, Plaintiff's life care planning expert, Marianne Boeing,[15] who admits that Plaintiff was obese *before* the Incident, testified that the "majority" of the medication cost in her life care plan is for a lifetime of weight loss drugs. (*Id*. ¶ 144). In fact, the lifetime cost of these prescription weight loss drugs accounts for more than 95% of Plaintiff's claimed damages for future medical costs. (*Id*. ¶ 145). This lifetime need for prescription weight loss medication contradicts even Dr. Lockey's recommendation of a six-month course of the drug. (*Id*. ¶ 146).

Plaintiff's vocational expert, Dr. Manges,[16] opined that Plaintiff's exposure to TDI caused him to "end[] his career" and that Plaintiff would have become an Adient "process manager" with a salary of $100,850.00 "had it not been for the March 2019 exposure of TDI." (*Id*. ¶ 147). However, Manges admits he never independently investigated whether Plaintiff had the necessary education and skills to be promoted to that position; nor does Manges know the actual salary of an Adient process manager. (*Id*. ¶ 149). Indeed, Manges' report explains that Plaintiff "is functioning at the 8th grade 4th month, 13th percentile on his reading ability" and "would have difficulty with understanding the meaning of words or communicating and understanding language above the high school level." (*Id*. ¶ 150).

---

[15] BASF is contemporaneously moving to exclude certain opinions offered by Ms. Boeing, as her opinions are based on speculation.

[16] BASF is contemporaneously moving to exclude the opinions of Ken Manges, Ph.D., as his opinions are based on pure speculation. Additionally, Plaintiff makes a higher salary now than he did when he worked at Adient. (PUF, ¶ 148).

Next, Dr. Rosen's[17] calculation of Plaintiff's loss of earning capacity is based solely on the baseless assumption that Plaintiff's earnings would jump to those of a process manager in 2024 and continue for years to come until retirement. (*Id.* ¶ 151). Based on this pure assumption, Rosen estimates that Plaintiff's diminished earning capacity is a range from $773,972 - $924,822. (*Id.* ¶ 152). Rosen also blindly accepted Boeing's lifetime medication opinion, with no investigation as to whether it was supported by any medical professional, opining that the present value of future care outlined in the life care plan is either $425,633 or $427,781—more than 95% of which represents the cost of a lifetime supply of weight loss medication. (*Id.* ¶ 153).

Meanwhile, BASF's pulmonology expert, Gregory Diette, M.D., opines that since the Incident, Plaintiff has gained excellent control of his asthma, and concludes that the TDI exposure did not cause a permanent or abnormal decline in lung function.[18] (*Id.* ¶ 154).

Because Plaintiff was morbidly obese prior to the Incident, Diette also concludes that the TDI exposure did not cause his obesity. (*Id.* ¶ 156). Diette additionally concludes that Plaintiff's asthma may have been present for years prior to the Incident. (*Id.* ¶ 157). Further, weight loss has been suggested for Plaintiff because of his obesity for many years, and Dr. Diette opines that it is premature to require Plaintiff to use weight loss prescription drugs before he has attempted a comprehensive approach to weight loss, which would include calorie restriction, exercise, and behavior modification. (*Id.* ¶ 158).

---

[17] BASF is contemporaneously moving to exclude the opinions of Harvey Rosen, as his opinions have no basis in fact.

[18] Dr. Lockey testified that, at least as of 2022, Plaintiff's lung volume was normal except for "ERV reduced;" as Dr. Lockey concedes, "ERV can be reduced with people who are markedly overweight or have morbid obesity." (PUF, ¶ 155).

## LAW AND ARGUMENT

### I.       STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Thus, "[w]hen a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Carroll v. Osborne*, No. 1:23-cv-84, 2024 WL 4945131, at *2 (S.D. Ohio Dec. 3, 2024) (Cole, J.) (quoting *Stansberry v. Air Wis. Airlines Corp*., 651 F.3d 482, 486 (6th Cir. 2011)). The movant informs the court of the basis for its motion and identifies the portions of the record that demonstrate "the absence of a genuine issue of material fact." *Rudolph v. Allstate Ins. Co*., No. 2:18-cv-11743, 2020 WL 4530600, at *3 (S.D. Ohio August 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Because there is no genuine issue of material fact, BASF is entitled to judgment as a matter of law, and the Court should grant BASF's Motion for Summary Judgment.

### II.      PER THE COURT'S PRIOR ORDER, PLAINTIFF'S NEGLIGENCE CLAIM FAILS WITH NO EVIDENCE THAT BASF VIOLATED THE HMTA OR AN HMR OR THAT BASF'S VIOLATION PROXIMATELY CAUSED PLAINTIFF'S INJURY.

On May 3, 2023, this Court granted in part and denied in part BASF's Motion to Dismiss (Doc. 37 at Page ID # 387-401), dismissing Plaintiff's negligence per se claims because, under Ohio law, violations of administrative codes do not give rise to valid, cognizable negligence per se claims. (*Id*. at Page ID # 398). The Court allowed Plaintiff's negligence claim against BASF to go forward; however, the Court clearly described the only way for Plaintiff to succeed:

> Plaintiff must show that one of the Defendants (1) engaged in conduct specifically prohibited by the HMTA (or an HMR promulgated under it), or (2) failed to perform some task specifically compelled by the HMTA (or an HMR promulgated under it). …[T]o the extent that his negligence claims…rely on alleged violations of specific

26

> HMTA or HMR provisions, he can assert the Defendant's **violation (if one occurred)**
> **as evidence of negligence**—in other words, as evidence that the Defendant breached
> its duty to operate and maintain the tank car reasonably safely. Of course, even if
> Plaintiff ultimately proves negligence, **he will also need to establish proximate cause**
> **and damages**...

(*Id*. at Page ID # 399) (emphasis added). This decision is wholly consistent with Ohio federal

district courts that "have held that in Ohio, a violation of a federal regulation is admissible as

evidence of negligence only." *Ok Yeon Yoon v. K-Ltd. Carrier, Ltd.*, No. 3:17CV2517, 2020 WL

1031486, at *7 (N.D. Ohio March 3, 2020); *see also Gruenbaum v. Werner Enters.*, No. 09-cv-

1041, 2011 U.S. Dist. LEXIS 9888, at *11 (S.D. Ohio Feb. 2, 2011)[19] (violations of the Federal

Motor Carrier Safety Regulations "may be considered by the trier of fact as evidence of

negligence."); *Earley v. United Airlines*, No. 2:05-cv-0835, 2006 WL 2794971, at *4 (S.D. Ohio

Sept. 28, 2006) (violation of "a Federal Aviation Administrative regulation, which is an

administrative rule, is only evidence of negligence.")

In reviewing an Ohio negligence claim, this Court must apply the law of Ohio, as

interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc*., 141 F.3d

612, 617 (6th Cir. 1998). The elements of an Ohio negligence claim are: (1) the defendant owed

plaintiff a duty; (2) the defendant breached that duty; and (3) such breach was the proximate cause

of plaintiff's injuries. *Scott v. Thomas & King, Inc*., No. 3:09-cv-147, 2010 WL 3603836, at *3

(S.D. Ohio Sept. 9, 2010). Although the existence of a breach and proximate causation is normally

a factual question left to the jury, where there is no genuine issue of fact for the jury to decide, a

court may grant summary judgment if the moving party is otherwise entitled to judgment as a

matter of law. *Hansen v. Wal-Mart Stores, Inc*., 2008-Ohio-2477, ¶ 12 (4th Dist.) (upholding grant

of summary judgment and determined that no breach occurred); *Nocilla v. Bridges*, No. 23-3184,

---

[19] A copy of this unreported opinion is attached as Exhibit A.

2023 WL 7550019, at *7 (6th Cir. Nov. 14, 2023) (applying Ohio law and determining that plaintiff did not establish proximate cause).

In sum, to succeed on his negligence claim, Plaintiff must establish: (1) that BASF committed a breach of a duty via violation of an applicable Federal Regulation; and (2) that BASF's violation proximately caused Plaintiff's claimed injury. Because Plaintiff cannot establish either element as a matter of law, the Court should grant summary judgment in BASF's favor on Plaintiff's negligence claim.

## III. PLAINTIFF'S NEGLIGENCE CLAIM FAILS BECAUSE BASF DID NOT VIOLATE ANY APPLICABLE FEDERAL REGULATION.

In his Complaint, Plaintiff alleges several negligent acts or omissions committed by BASF[20] that purportedly constitute negligence; however, only one of the claimed omissions is explicitly tied to a violation of a specific HMR: 49 CFR § 173.31. In his responses to BASF's Requests for Admission, Plaintiff identified with more specificity the regulations BASF purportedly violated. (Plaintiff's Second Responses to Defendant BASF Corporation's First Request for Admission to Plaintiff Dalton Merritt, "RFA Responses," Doc. 129-4 at Page ID # 9615-9624). These allegations fall into two categories: (1) allegations where no regulation actually compels the conduct allegedly constituting negligence, and (2) allegations relating to regulations concerning BASF's alleged failure to inspect/qualify the railcar and/or comport with the requirements of a "Shipper's Certificate."

---

[20] *See* operative Complaint, Doc. 1 at Page ID # 8-9, Paragraph 38 (a)-(k). Plaintiff's Motion for Leave to Amend the Complaint (Doc. 98) is pending. However, amendment, if allowed, would not impact BASF's arguments on summary judgment.

**A.** **Plaintiff admits that certain Federal Regulations do not compel the specific conduct alleged and admits that BASF complied with others.**

The Court previously explained that, in order to prove negligence, Plaintiff must show that BASF "(1) engaged in conduct specifically prohibited by the HMTA (or an HMR promulgated under it), or (2) failed to perform some task specifically compelled by the HMTA (or an HMR promulgated under it)." (Doc. 37 at Page ID # 399). In other words, Plaintiff must show that a regulation requires or prohibits the specific conduct upon which Plaintiff's claim is based. In his responses to BASF's Requests for Admission, Plaintiff admits that certain alleged failures that he asserts constitute negligence are ***not*** conduct compelled by any regulation. Specifically, Plaintiff admits that the regulations:

(1) "do not require BASF to employ a 'set or specific number of employees,'"[21]

(2) "do not address safety of the employees themselves,"[22]

(3) do not require BASF "to inspect its clients' equipment,"[23] and

(4) "do not impose warning obligations outside of proper placarding."[24]

---

[21] This allegation corresponds with Complaint Paragraph 38(b), namely that BASF failed to "provide a sufficient number of employees to ensure that its tank cars and equipment were properly secured and were not leaking." (Doc. 1 at Page ID # 9).

[22] This allegation corresponds with Complaint Paragraph 38(e), namely that BASF failed to "supervise its employees to ensure they were performing the required job in a safe and proper manner." (Doc. 1 at Page ID # 9).

[23] This allegation corresponds with Paragraph 38(f) of the Complaint, namely that BASF failed to "sufficiently inspect its cars and equipment, **or those of its clients** and contractors, to ensure that the cars were not leaking dangerous and toxic fumes and gasses." (emphasis added). (Doc. 1 at Page ID # 9).

[24] This allegation corresponds with Complaint Paragraph 38(h), namely, that BASF failed to "warn Plaintiff of reasonably foreseeable hazardous conditions existing with Defendant's equipment." (Doc. 1 at Page ID # 9).

(RFA Responses, Doc. 129-4 at Page ID # 9619-9622, Responses to RFA Nos. 2, 5, 6, 8). Plaintiff testified that on the morning of the Incident, the Tank Car was properly placarded. (PUF, ¶ 79).[25] Because Plaintiff admits that the alleged conduct in Complaint Paragraph 38(b), (e) and (f) is not compelled by any regulation or, with respect to Paragraph 38(h), that BASF properly complied, the conduct or omission alleged in each of these Paragraphs of the Complaint does not constitute a violation of any regulation and thus, as a matter of law, cannot serve as the basis for Plaintiff's negligence claim.

### B. BASF and IMTT are co-offerors and BASF is entitled to rely upon IMTT's inspection of the Tank Car.

Plaintiff alleges that "BASF's dual role requires it to inspect its tank cars for leaking hazardous materials."[26] (RFA Responses, Doc. 129-4 at Page ID # 9621, Response to RFA No. 6). This conclusion completely ignores the relationship between BASF and IMTT as co-offerors, which is specifically contemplated by the applicable Federal Regulations.

In the HMRs, a "person who offers or offeror" is defined as *any* person who does either or both of the following: (i) performs, or is responsible for performing, any pre-transportation function required under this subchapter for transportation of the hazardous material in commerce, and/or (ii) tenders or makes the hazardous material available to a carrier for transportation in commerce. 49 CFR § 171.8. The HMRs are clear that each offeror is *only* responsible for its specific functions and that each offeror may rely on information provided by another:

> There may be *more than one offeror* of a shipment of hazardous materials. Each offeror is responsible for complying with the requirements of this subchapter, or an

---

[25] This allegation corresponds with Complaint Paragraph 38(h), namely, that BASF failed "to warn Plaintiff of reasonably foreseeable hazardous conditions existing with Defendant's equipment." (Doc. 1 at Page ID # 9).

[26] This allegation corresponds with Complaint Paragraph 38(f), namely that BASF failed "to sufficiently inspect its cars and equipment, or those of its clients and contractors, to ensure that the cars were not leaking dangerous and toxic fumes and gasses." (Doc. 1 at Page ID # 9).

exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter, with respect to any pre-transportation function that it performs or is required to perform; however, *each offeror is responsible only for the specific pre-transportation functions that it performs or is required to perform, and each offeror may rely on information provided by another offeror*, unless that offeror knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the other offeror is incorrect.

49 CFR § 171.2(b)[27] (emphasis added). As such, BASF and IMTT are considered "co-offerors." (PUF, ¶ 37). Plaintiff's retained expert, Patrick Reilly[28], admits that IMTT qualifies as a co-offeror with BASF under the Federal Regulations. (*Id*.). The Federal Regulations allow there to be more than one offeror, with each offeror responsible for its specific pre-transportation functions. (*Id*. ¶ 38). IMTT was "responsible for complying with the requirements" of the regulations, specifically the pre-transportation external visual inspection, and BASF is entitled to "rely on information provided by" IMTT pursuant to 49 CFR § 171.2(b). (*Id*., ¶¶ 18, 39). Thus, pursuant to the HMRs, BASF was *not* required to inspect the Tank Car because IMTT did so, and no "dual role" required BASF to inspect the Tank Car loaded and inspected by IMTT. (Declaration of Mark Viz, Ph.D., P.E., "Viz Decl.," Doc. 129-11 at Page ID # 9941 ¶ 23). Thus, Plaintiff's negligence claim relating to inspection of the Tank Car fails.

## C. The Tank Car was properly inspected by IMTT in compliance with the regulations.

In his responses to BASF's Requests for Admission, Plaintiff alleges that BASF violated 49 CFR § 173.31 relating to inspection of railcar closures and tightening, sealing, and securing closures on the railcar because the Tank Car did not meet the requirements contained therein, including those found in subchapters 49 CFR § 173.31(d)(1), 49 CFR § 173.31(d)(1)(ii), 49 CFR

---

[27] Prior to March of 2019, there had been no release of TDI loaded by IMTT at a BASF customer facility as a result of a defective valve. (Martin Dep., Doc. No. 118-1 at Page ID # 7957).

[28] BASF is contemporaneously moving to exclude opinions offered by Plaintiff's expert, Patrick Reilly.

§ 173.31(d)(1)(iii), 49 CFR § 173.31(d)(1)(iv), and 49 CFR § 173.31(d)(2).[29] (RFA Responses, Doc. 129-4 at Page ID # 9619-9620, 9622, Responses to RFA Nos. 3, 10). The external inspection of the Tank Car completed by IMTT, an independent contractor, upon which BASF is entitled to rely, satisfied the requirements of 49 CFR § 173.31. (Viz Decl., Doc. 129-11 at Page ID # 9938, 9941 ¶¶ 10, 23).

49 CFR § 173.31 only requires an offeror using a tank car to transport hazardous materials to perform "external visual inspection" of, as is relevant here, (1) the piping, valves, fittings, and gaskets for corrosion, damage, or any other condition that makes the tank car unsafe for transportation, (2) any missing or loose bolts, nuts, or elements that make the tank car unsafe for transportation, and (3) all closures on tank cars and determine that the closures and all fastenings securing them are properly tightened in place by the use of a bar, wrench, or other suitable tool. 49 CFR § 173.31(d)(1)(ii), (iii), (iv). IMTT loaders completed this "external visual inspection" on February 19, 2019 pursuant to 49 CFR § 173.31, utilizing the IMTT-generated load checklist completed by two IMTT employees. (PUF, ¶¶ 25-26).

The IMTT load checklist includes, but is not limited to, checking that the mechanical components of the car are free of rust and dents, the valves in the protective housing cover operate properly, all fittings are leak-free, and the plugs installed on the Subject Valve are tightened to "wrench tight" by using an 18-inch pipe wrench. (*Id.*, ¶ 26). The purpose of using the IMTT load checklist, as acknowledged by IMTT, is to ensure that the tank cars are loaded "safely and according to all guidelines." (Deposition of Mark Martin, "Martin Dep.," Doc. No. 118-1 at Page ID # 7903-7904). The steps of the IMTT load checklist will identify defects with load valves or

---

[29] These allegations correspond with Complaint Paragraphs 38(c) and (k), namely that BASF failed "to properly tighten, seal, and secure its tank cars" and "to examine or perform a reasonable inspection of the tank car before shipping." (Doc. 1 at Page ID # 9).

valve handles, ensuring the valves are "working easily" and that the valves are "operational." (*Id.* at Page ID # 7963). If the IMTT load checklist is completed and signed off on, the external visual inspection is completed, and the railcar meets the requirements of the regulatory guidelines. (PUF, ¶ 32). The IMTT load checklist for the Tank Car was properly filled out and completed on February 19, 2019 and, therefore, the Tank Car was properly packaged pursuant to the HMRs. (PUF, ¶¶ 26, 42, 48; Deposition of Brad Gremillion, "Gremillion Dep.," Doc. 119-1 at Page ID # 8251—8252).

Next, Plaintiff alleges a violation of 49 CFR § 173.31(d)(2), which provides, in relevant part:

> Closures on tank cars are required…to be designed and closed so that under conditions normally incident to transportation… there will be no **identifiable release of a hazardous material** to the environment. … the lack of securement of any closure to a tool-tight condition, detected at any point, will establish a rebuttable presumption that a proper inspection was not performed by the offeror of the car. …

49 CFR § 173.31(d)(2) (emphasis added). There is no dispute that the Subject Valve did not leak product prior to loading or after loading and that the Tank Car made its journey from Geismar, Louisiana to Greenfield, Ohio without any identifiable release and the seal remained intact. (PUF, ¶ 52; Deposition of Thomas Johnson, "Johnson Dep.," Doc. No. 108-31 at Page ID # 4203; Deposition of Anthony Ippolito, "Ippolito Dep.," Doc. 120-1 at Page ID # 8444-8445). Plaintiff himself agreed that at the Adient plant, there was no indication that the Subject Valve had leaked, and he confirmed that the valves were in the closed position. (PUF, ¶ 76). He affirmed that he saw no product on top of the Tank Car the day of the Incident. (*Id.* ¶ 79). Based on this testimony and the lack of reported leaks from the subject Tank Car, the Subject Valve's closure was in a tool-tight condition through all conditions normally incident to movement, and BASF wholly complied with 49 CFR § 173.31(d)(2). (Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 15; PUF, ¶ 51).

33

**D.   The Tank Car was properly qualified at the time it was loaded in compliance with the regulations.**

Plaintiff also alleges that BASF violated 49 CFR § 180.509 by failing to adopt a maintenance and qualification program to recognize unsafe conditions, to prevent unsafe conditions from becoming a problem, and to ensure the Tank Car met DOT specifications.[30] (RFA Responses, Doc. 129-4 at Page ID # 9621-9622, Responses to RFA Nos. 7, 9). Because 49 CFR § 180.509 does not apply to BASF as a lessee that does not own the Tank Car, and because, regardless, the Tank Car was properly qualified, these arguments fail.

First, Plaintiff admits that 49 CFR § 180.509 "primarily" applies to the tank car *owner*: "49 CFR § 180.509 refers primarily to requirements imposed on 'tank car owners' and contains neither the phrase 'non-owner' nor the word 'lessee.'" (RFA Responses, Doc. 129-4 at Page ID # 9621, Response to RFA No. 7). "Tank car owner" is defined in 49 CFR § 180.503 to mean "the person to whom a rail car's reporting marks are assigned, as listed in the Universal Machine Language Equipment Register (UMLER)." Based on this definition, GATX is the Tank Car's owner. (Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 16; PUF, ¶ 1; Deposition of Patrick Reilly, "Reilly Dep.," Doc. 108-3 at Page ID # 2742). The title of 49 CFR § 180.509 is "*Requirements for inspection and test of specification tank cars*" and states that each tank car *owner*, here GATX, must ensure that a tank car facility inspect each item, evaluate each item, mark each tank car that is qualified to transport hazardous materials as such, and prepare the required documentation. 49 CFR § 180.509(a)(1)-(4). As such, BASF cannot be deemed to violate any provision of 49 CFR § 180.509

---

[30] These allegations correspond with Complaint Paragraphs 38(g) and (i), namely that BASF failed "to sufficiently maintain its cars and equipment to ensure that the cars were not leaking dangerous and toxic fumes and gasses and BASF failed to perform a proper 'Certification' of railcar GATX 31085, prior to offering the railcar for transportation, that contained a POISON INHALATION HAZARD'" and that BASF, with no applicable Federal Regulation, allowed "unsafe practices to become the standard practice." (Doc. 1 at Page ID # 9).

because the enumerated Federal requirements apply only to tank car owners, which BASF is not. (Viz Decl., Doc. 129-11 at Page ID # 9939-9940 ¶ 16, 21). Here, GATX performed its qualification inspection and testing of the Tank Car in 2016 when it was shopped at the GATX facility in Texas. (Viz Decl., Doc. 129-11 at Page ID # 9938, 9940 ¶¶ 6, 19).

Despite this admission, Plaintiff alleges that BASF, as the "service equipment owner," had a responsibility "for the development or adoption of a maintenance and qualification program to ensure that valve and fittings meet a performance specification." (RFA Responses, Doc. 129-4 at Page ID # 9622, Response to RFA No. 7). Part 180 of the HMRs is titled "*Continuing qualification and maintenance of packagings*." "Packaging" is defined as "a receptacle and any other components or materials necessary for the receptacle to perform its containment function in conformance with the minimum packing requirements of this subchapter," which includes, as is relevant here, the Tank Car. *See* 49 CFR § 171.8.

"Service equipment owner" is a defined term and means *only* "the party responsible for bearing the cost of the maintenance of the service equipment." 49 CFR § 180.503. There is *no requirement* for establishing a maintenance and qualification program to be implemented by a "service equipment owner." Rather, maintenance and qualification is to be accomplished by the Tank Car's "owner," here, GATX. (Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 16).

"Qualification" and "maintenance" are also specifically defined terms in the HMRs. "Qualification" is defined as follows, and specifies that the requirements are for the "owner":

> as relevant to a tank car, means the car and its components conforms to the specification to which it was designed, manufactured, or modified to the requirements of this subpart, to the applicable requirements of the AAR Specifications for Tank Cars (IBR, see § 171.7 of this subchapter), and to the **owner's** acceptance criteria. Qualification is accomplished by careful and critical examination that verifies conformance using inspections and tests based on a written program approved by the **tank car owner** followed by a written representation of that conformance. A tank car that passes the appropriate tests for

35

its specification, has a signed test report, *is marked to denote this passage*, and is considered qualified for hazardous materials transportation under this subchapter.

49 CFR § 180.503 (emphasis added). "Marked to denote this passage" refers to the packaging bearing its specifications stencil by GATX, here, "DOT111A100W1." (Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 17). The Tank Car was so marked when it left IMTT and travelled to Adient, as identified on IMTT's load checklist:

| | | | |
|---|---|---|---|
| 6. | Verified that railcar stencil is legible. | | |
| 7. | Verified railcar DOT stencil is 111A100W1. If DOT stencil does not match, contact Supervisor immediately. **DOT Stencil:** | 111A100W1 | |
| 8. | Is car stenciled "TOLUENE DIISOCYANATE" (BASF car). Re-stencil if necessary. | | |

(PUF, ¶ 26; Viz Decl., Doc. 129-11 at Page ID # 9940 ¶¶ 18, 20). The IMTT loader additionally ensured that the Tank Car was properly stenciled by GATX for TDI transport. *Id*. Because the Tank Car was so stenciled, the Tank Car had passed the "appropriate tests for its specification," pursuant to the HMRs, and therefore was properly qualified. (Viz Decl., Doc. 129-11 at Page ID # 9940 ¶ 19). It follows that Plaintiff's allegation that the Tank Car did not follow the DOT specifications is also without merit.[31] As explained, the Tank Car was properly stenciled by GATX as "DOT111A100W1" throughout its pre-transportation, transportation, and post-transportation functions. (*Id*. at Page ID # 9940 ¶ 18). No evidence suggests that the Tank Car did not satisfy the requirements of its DOT specification. (*Id*. at Page ID # 9940 ¶ 20). Thus, the Tank Car complied with the applicable DOT specifications, which were in any event the responsibility of GATX.

"Maintenance" is defined as "upkeep, or preservation, including repairs necessary and proper to *ensure an in-operation tank car's specification* until its next qualification." 49 CFR §

---

[31] This allegation corresponds with Complaint Paragraph 38(j), namely, that BASF failed "to follow the United States Department of Transportation Regulations and the Association of American Railroads Specification for Tank Cars (M-1002) to ensure that the tank car met the DOT specifications for the tank car when it was offered for transportation." (Doc. 1 at Page ID # 9).

180.503 (emphasis added). The Tank Car needed to be kept in sufficient condition to keep its specification, which, as explained, was DOT111A100W1. There is no evidence that any of the relevant parties – BASF, GATX, IMTT, or any railroad – determined that the Tank Car was improperly maintained so as to disallow it from continuing under its specification. The Tank Car maintained its specification during its journey from Louisiana to Ohio. (Viz Decl., Doc. 129-11 at Page ID # 9940 ¶¶ 18, 20). Therefore, BASF did not breach the provisions in 49 CFR § 180.509 with respect to the maintenance of the Tank Car.

Plaintiff's reference to "service equipment owner" (RFA Responses, Doc. 129-4 at Page ID # 9622, Response to RFA No. 7) appears to reference 49 CFR § 180.509(k)(2), which is not applicable to BASF and states: "**Each tank car facility** must qualify service equipment, including reclosing pressure relief devices and interior heater systems in accordance with the applicable provisions of Appendix D of the AAR Specifications for Tank Cars (IBR, see § 171.7 of this subchapter)." (emphasis added). The provisions in Table D.4 of Appendix D, Section 3, M-1002, applicable to GATX as the Tank Car owner, state that the service equipment maximum interval for requalification is 10 years:

**3.0 AAR SUPPLEMENTAL QUALIFICATION AND MAINTENANCE REQUIREMENTS FOR TANK CARS**

Table D.4 lists the AAR supplemental requirements for *qualification* and *maintenance* of all *tank car* classes. Any deviation from AAR supplemental requirements listed in the column titled "M-1002 Appendix D, Reference" of Table D.4 require *approval* by the Tank Car Committee.

Tank cars operating under a DOT Alternate Inspection Program (AIP) or TC Equivalency Certificate (EC) could have maximum inspection intervals that are in excess of federal regulations. Federal regulatory authorizations do not waive or exempt AAR supplemental requirements for *qualification* and *maintenance* of *tank cars* per this Appendix.

**Table D.4 AAR Supplemental Requirements for Tank Cars**

| Qualification of | Inspection and Test | M-1002, Appendix D, Reference | Maximum Interval |
|---|---|---|---|
| Tank | Visual Inspection | Paragraph 3.2.3 | 10 years |
|  | Structural Integrity | Paragraph 3.2.4 | 10 years |
|  | Safety System Inspection | Paragraph 3.2.6 | 10 years |
| Tank | Thickness Test | Paragraph 3.2.5 | Same as 49 CFR §180.509(f)/TC TP14877 Clause 9.5.8 |
| Service Equipment |  | Paragraph 3.3 | 10 years |
| Interior Lining / Coating |  | Paragraph 3.4 |  |
| Leakage Pressure Test |  | Paragraph 3.5 | After assembly |
| Freight Car Components and Systems | 88.B.2 Inspection | Paragraph 3.6 | 10 years; or as required by paragraph 3.6.1 |
| Underframe | Full Sill Inspection | Paragraph 3.6.2.3 | Included with Rule 88.B.2 Inspection |
|  | Stub Sill Inspection | Paragraph 3.7 | 10 years, mileage limit, or as required by paragraphs 3.7.1.2 or 3.7.1.3 |

(Viz Decl., Doc. 129-11 at Page ID # 9940 ¶ 21). The unrebutted evidence is that the Tank Car was properly requalified by GATX in 2016. (2016 GATX Maintenance and Inspection Records, Doc. 129-5 at Page ID # 9625-9663). Indeed, Plaintiff's own experts agrees that the qualification period for the Tank Car was ten years and that Tank Car passed all tests specified in 49 CFR § 180.511 in 2016. (PUF, ¶ 4). Because the Tank Car and service equipment were requalified by GATX less than ten years prior to the Incident, GATX did not violate 49 CFR § 180.509(k)(2) and BASF could not have.

Plaintiff's final allegation relating to 49 CFR § 180.509 is that BASF failed to "recogniz[e] unsafe conditions and practices and create[e] maintenance systems to prevent them from becoming a problem." (RFA Responses, Doc. 129-4 at Page ID # 9622, Response to RFA No. 9). This allegation too is without merit.

As explained, 49 CFR § 180.509 is titled "*Requirements for inspection and test of specification tank cars*" (emphasis added) and is applicable only to GATX. "Inspection and test" is defined as "a careful and critical examination of a tank car and its appurtenances performed by qualified personnel following the ***owner's*** qualified procedures." 49 CFR § 180.503 (emphasis added). As explained, this section of the HMRs is directed toward "qualification" and "maintenance" of tank cars, which, by definition, are both directed toward ensuring that tank cars conform to their *specification* by the Tank Car owner, GATX. *See* 49 CFR § 180.503. Because the Tank Car was marked DOT111A100W1, meaning it passed the "appropriate tests for its specification," and had been requalified within the last ten years, GATX did not breach the provisions in 49 CFR § 180.509 with respect to the maintenance of the Tank Car and the safety provisions therein and BASF cannot be held responsible for GATX's conduct. (Viz Decl., Doc. 129-11 at Page ID # 9940 ¶¶ 19, 21).

### E. BASF certified its compliance with the applicable regulations via EDI.

Plaintiff asserts, through his liability experts,[32] Thomas Johnson and Patrick Reilly, that BASF violated 49 CFR § 172.204 and § 171.2 because BASF and employee Bill Drum did not sign the "Shipper's Certification." (Dep. Ex. 143, Doc. 108-33 at Page ID # 4355-4356; Dep. Ex. 132, Doc. 108-5 at Page ID # 3075-3078, 3115-3116). This argument fails.

49 CFR § 171.2(i) provides:

> No person may certify that a hazardous material is offered for transportation in commerce in accordance with the requirements of this subchapter unless the hazardous material is *properly classed, described, packaged, marked, labeled, and in condition for shipment* as required or authorized by applicable requirements of this subchapter or an exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter. Each person who offers a package containing a hazardous material for transportation in commerce in

---

[32] Plaintiff's proposed punitive damages claim in his proposed Amended Complaint also centers around alleged regulatory violations concerning a "Shipper's Certification." (Doc. 98-1 at Page ID # 1849-1855).

accordance with the requirements of this subchapter or an exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter, must assure that the package remains *in condition for shipment until it is in the possession of the carrier.*

49 CFR § 171.2(i) (emphasis added). As explained, these requirements were satisfied when IMTT, as co-offeror with BASF, completed its pre-transportation "external visual inspection" of the Tank Car. (PUF, ¶¶ 32, 37). That Mr. Drum, the BASF employee whose name appears on the EDI transmission, did not "sign" a "Shipper's Certification" is irrelevant with respect to the proper completion of the requirements provided in the HMRs. (Viz Decl., Doc. 129-11 at Page ID # 9940-9941 ¶ 22).

BASF did not violate 49 CFR § 172.204 either. The regulation provides:

[E]ach person who offers a hazardous material for transportation shall certify that the material is offered for transportation in accordance with this subchapter by printing (manually or mechanically) on the shipping paper containing the required shipping description the certification contained in paragraph (a)(1) of this section or the certification (declaration) containing the language contained in paragraph (a)(2) of this section. For transportation by rail only, the certification may be received verbally or **with an electronic signature** in conformance with paragraphs (a)(3)(i) and (a)(3)(ii) of this section.

49 CFR § 172.204(a) (emphasis added). For transportation by rail, the shipper, here BASF, may certify the shipment through electronic means, which is referred to as an EDI. *See* 49 CFR § 172.204(a)(3)(ii). Specifically, the regulation provides:

When transmitted electronically, by completing the field designated for the shipper's signature with the name of the principal person, partner, officer, or employee of the offeror or their agent, the *shipper* is also certifying its compliance with the certification specified in this paragraph (a).

*Id.* (emphasis added). Here, once a railcar was properly loaded and inspected by IMTT, IMTT "board operators" confirmed the volume that was loaded on that railcar. (PUF, ¶ 33). Only after the Tank Car is safely loaded and properly inspected did IMTT sent the information relating to the Tank Car to BASF via EDI into BASF's SAP system. (*Id.* ¶¶ 33, 35). IMTT did not enter any data

into BASF's SAP system if the tank car was not in proper/safe condition for transportation according to applicable Federal Regulations. (*Id.*). BASF then sent this information via EDI to a third-party contractor, QTS, which in turn transmitted the EDI directly to the railroads. (*Id.* ¶ 36). The "shipper's signature" is the name of the "the name of the principal person, partner, officer, or employee of the offeror or their agent." 49 CFR § 172.204(a)(3)(ii). At the time the Tank Car was shipped, Mr. Drum was the Site Logistics Manager at BASF in Geismar. By placing Mr. Drum's name on the EDI transmission, the shipper – BASF – "is also certifying its compliance with the certification…" (*Id.*) (Ippolito Dep., Doc. 120-1 at Page ID # 8438). The EDI is sent directly to the railroad, and not to the customer, here, Adient. (PUF, ¶¶ 33-34). According to PHMSA guidance, BASF is permitted to rely upon IMTT's external visual inspection and consider it "direct knowledge" of that information (Viz Decl., Doc. 129-11 at Page ID # 9941 ¶ 23):

> An offeror may rely on information provided by another offeror and consider it direct knowledge, unless that offeror knows or a reasonable person acting in the circumstances and exercising reasonable care would know, that the information provided is incorrect.

(PUF, ¶ 40).[33] Prior to March of 2019, there had been no release of TDI from an IMTT loaded railcar at a BASF customer facility as a result of a defective valve. (Martin Dep., Doc. No. 118-1, Page ID # 7957). Additionally, no EDI is inputted by IMTT unless the particular tank car is properly inspected. (PUF, ¶ 35). Moreover, BASF need not physically inspect the railcars because its co-offeror, IMTT, does so (Viz Decl., Doc. 129-11 at Page ID # 9941 ¶ 23):

> [I]f the [Company A] physically inspected the cars while [Company B] prepared the shipping documentation for the cars, both entities would be considered offerors for purposes of the HMR and would be responsible for performing their respective offeror functions in accordance with the HMR. In this case, [Company B] would not be required to perform the physical inspection of the cars required under § 173.31 (d).

---

[33] Available at https://www.phmsa.dot.gov/regulations/title49/interp/09-0064 (last visited 5/26/25).

41

(PUF, ¶ 41).[34]

Even if the Court disregards the electronic information flow between IMTT, BASF, and the railroad and concludes that there is a genuine issue of fact regarding BASF's compliance with 49 CFR § 171.2 or § 172.204, it is wholly *irrelevant* to causation of the Incident. Plaintiff must establish that the allegedly noncompliant "Shipper's Certificate" proximately caused his injuries resulting from the Incident, which he cannot do. Indeed, in Ohio, the proximate cause of an event is one "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred." *Hanko v. Nestor*, 2019-Ohio-2256, ¶ 55. The name on the "Shipper's Certification" in no way can be said to have produced the Incident. It is undisputed that the Tank Car was safely and securely transported from Geismar, Louisiana, to Greenfield, Ohio with no release. (PUF, ¶ 52; Ippolito Dep., Doc. 120-1 at Page ID # 8444-8445). Adient never received a "Shipper's Certification" and certainly never received the EDI transmission, as it goes only to CN railroad. (PUF, ¶¶ 33-36). Thus, the requirements from the HMRs regarding the "Shipper's Certification" is not relevant to causation and played no role in the Incident that occurred while Plaintiff unloaded the Subject Tank Car. (Viz Decl., Doc. 129-11 at Page ID # 9940-9941 ¶ 22).

**F.**     **As Bill Drum did not have to personally inspect the railcar for BASF to certify its compliance with the regulations, BASF did not violate any regulations relating to employee training.**

Plaintiff alleges that BASF violated 49 CFR § 172.704 relating to employee training because "Bill Drum…does not have adequate training to inspect the tank cars which bear his name on the Shipper's Certification." (RFA Responses, Doc. 129-4 at Page ID # 9619, Response to RFA

---

[34] Available at https://www.phmsa.dot.gov/regulations/title49/interp/04-0008 (last visited 5/26/25).

No. 1).[35] Similarly, Plaintiff alleges that BASF violated 49 CFR § 172.704 relating to putting procedures in place to ensure safety and security of tank cars because Bill Drum was not adequately trained. (RFA Responses, Doc. 129-4 at Page ID # 9620, Response to RFA No. 4).[36]

First, pursuant to PHMSA guidance, BASF's reliance upon its independent contractor IMTT's inspection, as a co-offeror of the TDI, is wholly proper and in compliance with Federal Regulations. (PUF, ¶ 40). BASF is "not be required to perform the physical inspection of the cars" because IMTT "physically inspected the cars" while BASF "prepared the shipping documentation." (*Id.* ¶ 41). Bill Drum, Logistics Manager at BASF Geismar, understood the contractual relationship between IMTT and BASF, and understood that BASF relied upon IMTT for its expertise to ensure railcars were properly loaded and safe for transportation. (*Id.* ¶ 18). Indeed, IMTT agreed that it was IMTT's responsibility to ensure its employees were properly trained to load railcars and that their inspections satisfied the requirements of the Federal Regulations. (*Id.* ¶¶ 22-23; Martin Dep., Doc. No. 118-1 at Page ID # 7885-7886, 7893).

This contractual relationship between BASF and IMTT is contemplated by the regulations themselves. 49 CFR § 171.2(b) explicitly states that "[t]here may be ***more than one*** offeror of a shipment of hazardous materials" and that "each offeror is responsible only for the ***specific pre-transportation functions*** that it performs or is required to perform, and each offeror ***may rely on information*** provided by another offeror." (emphasis added). IMTT was responsible for

---

[35] This allegation corresponds with paragraph 38(a) of the Complaint, namely that BASF failed "to ensure that its employees were trained to properly secure tank cars and equipment that contained toxic substances and Ensuring that the hazardous material training included a proper inspection of the service equipment on tank cars and corrective actions to be taken when such equipment is not working as intended." (Doc. 1 at Page ID # 9).

[36] This allegation corresponds with paragraph 38(d) of the Complaint, namely that BASF failed "to have proper procedures in place to ensure that its tank cars and equipment were safe and secure for shipment." (Doc. 1 at Page ID # 9).

Case: 1:21-cv-00067-DRC Doc #: 131 Filed: 05/30/25 Page: 51 of 60 PAGEID #: 10153


performing the pre-transportation function of the external visual inspection and BASF properly relied upon that information. (PUF, ¶¶ 18, 37-40).

There is no requirement that the person whose name appears on the EDI transmission, as authorized by 49 CFR § 172.204(a)(3)(ii) as a way to certify a shipment, personally inspect each and every railcar that leaves a third-party loader's facility. When a certification of a shipment is sent via EDI, the signature of the "principal person," which here is Mr. Drum,[37] also certifies BASF's compliance with the certification specified in 49 CFR § 172.204(a).[38] *See* 49 CFR § 172.204(a)(3)(ii). BASF relied entitled to rely upon IMTT (PUF, ¶ 18), and IMTT did not enter any information regarding any tank car unless it passed its inspection and was safe for transportation. (*Id*. ¶¶ 33-35, 47).

Because there is no genuine issue of material fact that any alleged violation of a regulation by BASF proximately caused Plaintiff's injury, BASF is entitled to summary judgment.

## IV. PLAINTIFF'S NEGLIGENCE CLAIM FAILS BECAUSE HE CANNOT ESTABLISH PROXIMATE CAUSATION.

Even if Plaintiff can establish that BASF violated a Federal Regulation, which he cannot, Plaintiff cannot establish proximate causation. *Scott*, 2010 WL 3603836 at *3. Proximate cause arises "where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act . . ." *Sanders v. United States*, No. 1:04-cv-00022, 2005 WL 8161515, at *2 (S.D. Ohio Oct. 19, 2005) (citation omitted). Under Ohio law, the issue becomes a question of law which can be determined on summary judgment

---

[37] Contrary to Plaintiff's allegations, Bill Drum received DOT training, including training regarding the specific requirements of the HMRs. (Doc. 107-17 at Page ID # 2533-2545).

[38] The certification language required is as follows: "This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation." 49 CFR § 172.204(a)(1).

where the facts are undisputed. *Devonshire v. Johnston Group First Advisor*s, 166 Fed. Appx. 811, 815 (6th Cir. 2006).

Plaintiff cannot establish proximate cause for several reasons. First, there were multiple intervening, superseding causes: (1) Adient's failure to continually supply fresh air to Plaintiff during the Incident; (2) Adient's failure to provide proper PPE as required by Federal Regulations, BASF's SDS, and its own training materials; and (3) Plaintiff's own negligence. Additionally, Adient was a sophisticated user/learned intermediary of TDI, thus discharging BASF of any duty to warn.

### A. There were multiple intervening causes superseding the Incident, thus cutting off BASF's potential liability.

An intervening cause "breaks the causal chain between negligence and injury." *Chapman v. Milford Towing & Serv.*, 499 Fed. Appx. 437, 442-443 (6th Cir. 2012), citing *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St. 3d 266, 269-70 (1993).[39] The Sixth Circuit, citing the Ohio Supreme Court, has held that "the test to be used to determine whether the intervening act was foreseeable and therefore a consequence of the original negligent act or whether the intervening act operates to absolve the original actor" is "whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor." *Id*. Thus, whether an intervening cause exists is "dependent upon whether the intervening cause was reasonably foreseeable to the one who was initially negligent. The intervening cause must be

---

[39] Only where "reasonable minds might differ as to the foreseeability of a particular risk or the character of an intervening cause," is the question of intervening cause one for submission to the jury." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co*., 219 F.3d 519, 543 (6th Cir. 2000).

disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury." *Id*.

Here, there is no dispute that the malfunctioning of Plaintiff's fresh air supply is an intervening cause that was wholly unforeseeable. (PUF, ¶¶ 95, 105). Adient itself admits that a root cause of Plaintiff's exposure was that team members were trying to connect a hose that did not have the correct fitting and that the valves on the ENMET system were not labeled. (*Id*. ¶ 102). Two Adient employees present at the time of the Incident, Mr. Jones and Mr. Postell, confirmed that Plaintiff's air supply was cut off due to confusion as to the correct connection for Plaintiff's air supply hose. (*Id*. ¶ 104). Mr. Postell agreed that this occurrence was "unexpected and unanticipated." (*Id*. ¶ 105). Indeed, there is no dispute that there had never been a TDI railcar leak or release at the Adient Greenfield facility before. (*Id*. ¶ 106). Plaintiff also testified that it came as a "complete surprise" that his plant air was cut off, as it had never happened before. (*Id*. ¶ 95). Adient admits that it was its own "team members" who cut off Plaintiff's air supply. (*Id*. ¶ 102). As such, the occurrence was wholly outside of BASF's control and within Adient's control (Declaration of John W. Spencer, C.I.H., C.S.P., "Spencer Decl.," Doc. 129-8 at Page ID # 9680 ¶ 10), and thus, there is no "link" between BASF's purported negligence and Plaintiff's exposure, *Chapman*, 499 Fed. Appx. at 442-443, especially because Plaintiff admits that he only began inhaling TDI fumes after his plant air was cut off. (PUF, ¶¶ 88-90).

In addition, Adient's failure to provide Plaintiff with the proper PPE and with a safe escape is also an intervening cause. Adient's own HAZWOPER training required the same escape air to be provided, (*Id*. ¶ 113), but none was provided to Plaintiff; nor was he ever trained to use it. (*Id*. ¶¶ 115, 117). Plaintiff testified that the purpose of the escape air bottle was to provide about five minutes of clean air in case the plant air supply was interrupted, as here, in the event of a spill or

46

release. (*Id.* ¶ 116). Indeed, had Plaintiff been provided escape air as required by BASF, OSHA, and Adient's own training, Plaintiff could have used it to escape the hot zone when his air supply was unexpectedly cut off. But Plaintiff did not have that option because escape air was never provided to him. There is no dispute that it was wholly Adient's responsibility to supply PPE to its employees, and Adient failed to do so. (*Id.* ¶ 111). Adient's failure to provide escape air to its employees is thus an intervening, superseding cause of Plaintiff's exposure because BASF could not have foreseen that Adient would wholly *ignore* the OSHA requirements, Adient's training, and BASF's SDS. (*Id.* ¶¶ 112, 117).

Additionally, Adient did not provide its employees with a safe escape from the "hot zone." Plaintiff testified that he knew his air hose, even if working, was not long enough to escape the hot zone. (*Id.* ¶ 96; Deposition of Dalton Merritt, "Pl. Dep.," Doc. 108-20 at Page ID # 3800, 3804). Despite being consider about his safety, Plaintiff never voiced a complaint to Adient. (Pl. Dep., Doc. 108-20 at Page ID # 3883). Plaintiff explained that the connected air hose was long enough to allow the user to get inside the plant, but he would not have been able to close the door all the way or get away from fumes from a release. (PUF, ¶ 97). Thus, due to his air supply being cut off, having no option to use escape air, and having no safe escape, Plaintiff instead had to "save his own life" and expose himself to TDI fumes in order to escape the hot zone. (*Id.* ¶ 94; Spencer Decl., Doc. 129-8 at Page ID # 9681 ¶ 11).

Finally, Plaintiff's own negligence is an intervening cause. Adient attributed Plaintiff's exposure to Plaintiff's failure to leave the area immediately after the release was stopped and failure to have a second person present when connecting to railcar. (PUF, ¶ 102). Mr. Postell explained that it was determined that a second person should have been present when connecting and disconnecting equipment, but Plaintiff failed to follow this Adient procedure. (*Id.* ¶ 108). Mr.

47

Jones confirmed that, according to Adient's procedure, Plaintiff should have immediately evacuated the area, instead of spraying himself with neutralizer and attempting to clean up, as that is "not [Adient's] procedure." (Id. ¶ 109). He also testified that had Plaintiff left the area as he was trained to, he would have avoided inhaling any chemical fumes. (*Id*. ¶ 110). Mr. Jones also explained that all Adient employees who unload railcars are trained to fill out a "TDI Unload Checklist," which Plaintiff openly admitted that he did not do. (*Id*. ¶ 107). Further, Plaintiff was trained by Trefz to use a pipe wrench to remove the valve plug (which necessitates bending down near the Subject Valve's valve stem and handle making them easier to observe), but Plaintiff instead chose to use a long t-wrench the day of the Incident. (*Id*. ¶ 62). As explained, Plaintiff's use of a long t-wrench, as opposed to a pipe wrench, on the day of the Incident explains why he only "observed" the Subject Valve's handle from six feet away and never bent down to look at the valve handle or the valve stem to see if it was out of position. (*Id. ¶* 64). Thus, if there was any external visual evidence that something was awry with the Subject Valve, Plaintiff would never have known because he used the incorrect wrench and violated his training.

Each of these intervening causes – Adient's failure to continually supply fresh air to Plaintiff during the Incident, Adient's failure to provide proper PPE, and Plaintiff's own negligence –was a "new and independent act or cause which intervenes" that "absolves" BASF of any potential liability. *Chapman*, 499 Fed. Appx. at 442-443. Thus, as a matter of law, Plaintiff cannot prove proximate causation, and his negligence claim fails.

**B.** **Adient is a sophisticated user of TDI, and thus, BASF had no duty to warn Adient about the dangers of TDI.[40]**

The sophisticated user defense[41] establishes that "a product manufacturer need not warn members of a trade or profession about dangers generally known to that trade or profession." *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *103 (N.D. Ohio 2010). Under this defense, a manufacturer can discharge its duty to warn by providing the necessary information to an intermediary upon whom it can reasonably rely to communicate the information to the ultimate user of the product. *Midwest Specialties v. Crown Indus. Prods. Co.*, 940 F. Supp. 1160, 1165 (N.D. Ohio 1996). A manufacturer does not act unreasonably by failing to warn intermediate purchasers of dangers of which the intermediate purchasers are *already knowledgeable*. *Id.* (emphasis added).

There is no dispute that Adient was fully aware and knowledgeable of the dangers of working with TDI, was aware of the steps that needed to be taken to protects its employees from the dangers of TDI, and ensured its employees were aware of "the level of hazard" of TDI. (PUF, ¶ 56). Indeed, Mr. Jones of Adient admitted outright that Adient is a "sophisticated user" of TDI and was fully aware of the hazards and dangers of working with TDI. (*Id.* ¶ 57). As such, BASF cannot be liable for failing to warn Adient of anything, as Adient was already knowledgeable of the dangers of TDI.

---

[40] This is closely related to the "learned intermediary" defense. *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *103 (N.D. Ohio 2010). The learned intermediary defense holds that a product manufacturer can discharge its duty to warn by providing information about the dangers of the product to a third person, upon whom it can reasonably rely to communicate the information to the product's end-users. *Id.* Here, the third-person was Adient, but the end user was also Adient. Because the defenses are so similar, BASF's arguments based on the sophisticated user defense also incorporate the learned intermediary defense.

[41] Affirmative defenses may be resolved at summary judgment, and the defendant has the burden to show that it is entitled to the defense. *Cline v. Dart Transit Co.*, No. 21-3468, 2023 WL 3003190, at *4 (6th Cir. April 19, 2023).

Additionally, Adient fully trained its employees regarding safety procedures for working with or around TDI and proper PPE usage in annual HAZWOPER training. (*Id*. ¶ 54). The SDSs for TDI, such as BASF's, were available in hard copy for all employees in the breakroom and the tank farm. (Id. ¶ 55). According to Plaintiff, the Tank Car itself was properly placarded, and he was fully aware that the Tank Car carried TDI. (*Id*. ¶ 79). Not only did BASF directly warn of the dangers of TDI through its provided SDS, but Adient warned its own employees of the potential hazards and provided training on the same.

Because Adient was knowledgeable of the dangers of TDI and the Tank Car was properly placarded, BASF was discharged of any duty to warn and is entitled to summary judgment.

## V. ALTERNATIVELY, PLAINTIFF'S NEGLIGENCE CLAIM FAILS BECAUSE HE LACKS RELIABLE EXPERT TESTIMONY TO SUPPORT HIS CLAIM.

Ohio law requires expert testimony to prove one or more elements of negligence where the element addresses matters "beyond the common knowledge and understanding of a layperson." *Nocilla v. Bridges*, No. 23-3184, 2023 WL 7550019, at *4 (6th Cir. Nov. 14, 2023). Further, the Supreme Court of Ohio has pronounced that "[u]nless a matter is within the comprehension of a layperson, expert testimony is necessary. Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the acts." *West v. Heimermann*, No. 3:20-cv-382, 2022 WL 1719676, at *8 (S.D. Ohio May 27, 2022), quoting *Ramage v. Central Ohio Emergency Services, Inc*., 64 Ohio St. 3d 97, 102 (1992). Ohio courts have generally found that issues such as complex medical determinations, professional standards of care, and medical causation are outside the comprehension of a layperson, thus necessitating expert testimony. *Id*. Summary judgment is appropriate where a plaintiff lacks admissible expert testimony required to prove its claim. *See Rose v. Truck Ctrs., Inc*., 611 F. Supp. 2d 745, 752 (N.D. Ohio April 24, 2009).

Here, Plaintiff lacks admissible expert testimony to establish breach, causation, and damages, and therefore, BASF is entitled to summary judgment.[42] BASF is contemporaneously moving to exclude certain opinions of Plaintiff's liability experts, Thomas Johnson and Patrick Reilly, because their opinions are based on unreliable, post-accident inspections of the Subject Valve, among other insufficiencies, rendering their opinions in admissible. As such, Plaintiff cannot establish that the Subject Valve was "defective" and therefore cannot establish any breach or causation. Also, BASF is contemporaneously moving to exclude certain opinions of Plaintiff's medical causation expert, Dr. Chiodo, on the grounds that such opinions are not based on sufficient facts or data or are not the product of reliable principles and methods. Finally, BASF is contemporaneously moving to exclude opinions offered by Plaintiff's damages experts, Dr. Lockey, Dr. Manges, Dr. Rosen, and Ms. Boeing, as certain of their opinions are based on speculation and lack a sufficient credible factual basis. Because Plaintiff cannot establish breach, causation, and damages without reliable, admissible expert testimony, his negligence claim fails, and BASF is entitled to judgment as a matter of law.

## <u>CONCLUSION</u>

For the foregoing reasons, BASF respectfully requests that the Court grant BASF's Motion for Summary Judgment.

---

[42] BASF respectfully directs the Court to BASF's Motion to Exclude for full discussion of these issues.

Dated: May 30, 2025

                        Respectfully submitted,

                        */s/ Timothy J. Coughlin*

Timothy J. Coughlin (0019483)
Tim.Coughlin@thompsonhine.com
Andrea B. Daloia (0074016)
Andrea.Daloia@thompsonhine.com
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800

Emily G. Montion (0093625)
Emily.Montion@thompsonhine.com
Brianna D. Vollman (0101144)
Brianna.Vollman@thompsonhine.com
**THOMPSON HINE LLP**
312 Walnut Street
Suite 2000
Cincinnati, OH 45202-4024
Telephone: (513) 352-6700
Facsimile: (513) 241-4771

*Attorneys for Defendant BASF Corporation*

52

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 30, 2025, a copy of foregoing *Defendant BASF Corporation's Motion for Summary Judgement and Memorandum of Law in Support of Motion* were filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

<u>/s/ *Timothy J. Coughlin*</u>
*One of the Attorneys for Defendant*
*BASF Corporation*