**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | | |
|---|---|---|
| **DALTON MERRITT,** | ) | |
| | ) | **Case No. 1:21-cv-00067-DRC** |
| **Plaintiff,** | ) | |
| | ) | |
| **- vs -** | ) | **Judge Douglas R. Cole** |
| | ) | |
| **BASF CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PROPOSED UNDISPUTED FACTS OF DEFENDANT BASF CORPORATION**

Pursuant to the Court's Standing Orders, Defendant BASF Corporation ("BASF") offers the following Proposed Undisputed Facts:

**I.  RAIL TANK CAR GATX31085**

1.      The Tank Car was owned by former defendant GATX and was initially leased to BASF in 1982 pursuant to a master lease. (GATX Responses and Objections to Plaintiff's First Set of Interrogatories, "GATX Rog. Responses," Doc. 129-1 at Page ID # 9585, Response to Rog. No. 6; Deposition of Joseph Dawson, "Dawson Dep.," Doc. 108-1 at Page ID # 2590; Declaration of Mark Viz, Ph.D., P.E., "Viz Decl.," Doc. 129-11 at Page ID # 9938 ¶ 5; GATX/BASF Master Lease, Doc. 129-6 at Page ID # 9665-9669).

2.      Pursuant to the master lease between GATX and BASF, GATX was responsible for keeping "each car maintained in accordance with the AAR Rules and the rules and regulations of the U.S. Department of Transportation and of any other federal authorities..." (GATX/BASF Master Lease, Doc. 129-6 at Page ID # 9667 ¶ 6).

3.      The Tank Car was last "shopped" by GATX for its federally required 10-year inspection at the GATX facility in Hearn, Texas in January to March 2016, during which the Tank

Car was fully inspected, and GATX installed the top load valve at issue (the "Subject Valve"). (Deposition Exhibit ("Dep. Ex.") 1, Doc. 108-27 at Page ID # 4075; GATX Rog. Responses, Doc. 129-1 at Page ID # 9586, Response to Rog. No. 7).

4.     The Tank Car was "qualified for use" at that time pursuant to 49 CFR § 180.509 by passing all tests and inspections set forth in 49 CFR § 180.511 in 2016. (Deposition of Thomas Johnson, "Johnson Dep.," Doc. No. 108-31 at Page ID # 4180-4183; Deposition of Patrick Reilly, "Reilly Dep.," Doc. 108-3 at Page ID # 2758-2759).

5.     In October 2018, the pressure relief valve on the Tank Car, which is wholly different than the Subject Valve, was tested and replaced by GATX. (Repair Records Dated 10/2018, Doc. 129-2 at Page ID # 9597-9601; Viz Decl., Doc. 129-11 at Page ID # 9938 ¶ 7; Reilly Dep., Doc. 108-3 at Page ID # 2774-2775).

6.     At that time, the Subject Valve passed the GATX "leakage pressure test." (Repair Records Dated 10/2018, Doc. 129-2 at Page ID # 9601; Reilly Dep., Doc. 108-3 at Page ID # 2775).

7.     In addition, there were no identified issues with the Subject Valve's handle or any noted buildup of product. (Reilly Dep., Doc. 108-3 at Page ID # 2777).

8.     From 2016 through 2019 the Tank Car, while in service, underwent multiple "touch up paintings" that IMTT employees testified were necessary due to TDI customers leaking drips of product when detaching the unloading hose or to paint over graffiti. (Deposition of Brad Gremillion, "Gremillion Dep.," Doc. 119-1 at Page ID # 8221-8222; Deposition of Mark Martin, "Martin Dep.," Doc. No. 118-1, Page ID # 7932-7933, 7937-7938).

9.     The "touch up paintings," done by GATX at IMTT's Geismar, Louisiana facility after the Tank Car was loaded, had nothing to do with valve integrity. (Gremillion Dep., Doc. 119-1 at Page ID # 8221-8222; Martin Dep., Doc. No. 118-1, Page ID # 7932-7933, 7937-7938).

10.     Indeed, the need for such "touch up painting" on this Tank Car was not an indication of a leaking or defective valve. (Martin Dep., Doc. No. 118-1 at Page ID # 7955-7957).

11.     GATX also conducted "visual walk-around inspection[s]" of the railcars at BASF's Geismar facility pursuant to an agreement with BASF. (GATX/BASF Car Inspection and Repair Agreement, Doc. 129-3 at Page ID # 9602).

12.     GATX also inspected the Tank Car when it performed touch up painting. (Martin Dep., Doc. No. 118-1 at Page ID # 7932).

13.     No issue was identified by GATX on the Tank Car on February 19, 2019, when it was inspected prior to the touch up painting. (Dep. Ex. 217, Doc. No. 118-3 at Page ID # 8162).

## II.     TANK CAR LOADING BY IMTT

14.     In December 2005, BASF contracted with IMTT to "develop, construct and operate the "GLC" ("Services Agreement"), which included IMTT's responsibilities for loading railcars at its Geismar facility with various chemicals produced by BASF. (Dep. Ex. 141, Doc. 108-14 at Page ID # 3439).

15.     GLC is defined in the Services Agreement as:

all physical assets necessary or useful in the operation of a public logistics facility, or otherwise located on land and personalty that is being sold, leased or otherwise provided to [IMTT] in connection with this transaction as well as on land and/or personalty acquired from third parties. Without limiting the generality of the foregoing, the GLC will include all storage tanks, Drum filling equipment and facilities, warehouses, truck and rail filling stations, and jetties located on or adjacent to such land, and all associated facilities and appurtenances.

(Dep. Ex. 141, Doc. 108-14 at Page ID # 3439, § 1.1(c)).

3

16.     The Services Agreement also delineates the responsibilities of BASF and IMTT:

As BASF is relying upon [IMTT]'s skills and experience in the performance of the Services under this Services Agreement, [IMTT] alone will be responsible for supervising its personnel.

(Dep. Ex. 141, Doc. 108-14 at Page ID # 3473, § 14.6(c).

17.     Finally, the Services Agreement explains that IMTT is an independent contractor:

Nothing contained in this Services Agreement will be construed to make either [IMTT] or BASF partners, joint venturers, principals, agents, or employees of the other. Neither Party will have any right, power, or authority, express or implied, to bind the other Party.

(Dep. Ex. 141, Doc. 108-14 § 14.6(a)).

18.     Indeed, IMTT understood in 2019 that IMTT was ***not*** an agent of BASF pursuant to the Services Agreement and that BASF relied upon IMTT for its expertise to ensure railcars were properly loaded and safe for transportation. (Martin Dep., Doc. No. 118-1, Page ID # 7894-7895, 8062; Deposition of Bill Drum, "Drum Dep.," Doc. 108-38 at Page ID # 4467).

19.     As of 2019, IMTT provided its employees with safety training and instruction on proper loading of TDI railcars and the PPE to be worn and was responsible for providing its employees with proper PPE to load TDI railcars. (Martin Dep., Doc. No. 118-1, Page ID # 7897-7899).

20.     IMTT's required PPE in 2019 for loaders of TDI railcars included a chemical apron, nitrile gloves, fresh air supply via hose, and an escape air pack. (Martin Dep., Doc. No. 118-1 at Page ID # 7899; Gremillion Dep. Doc. 119-1 at Page ID # 8206, 8320-8321).

21.     BASF employees were not present when IMTT loaded TDI railcars at its facility; nor did BASF control IMTT's inspection process. (Martin Dep., Doc. No. 118-1 at Page ID # 7896).

4

22.     Importantly, pursuant to the Services Agreement, IMTT expressly agreed to perform its obligations in compliance "with all laws, rules, regulations, ordinances, codes, orders (judicial or administrative) and decrees of any entity having jurisdiction…" (Dep. Ex. 141, Doc. 108-14 at Page ID # 3449, § 7.2(f); Martin Dep., Doc. No. 118-1 at Page ID # 7893).

23.     Namely, IMTT was required to carry out its duties in compliance with the HMRs, which were developed and promulgated by PHMSA, an agency of the DOT. (Viz Decl., Doc. 129-11 at Page ID # 9938 ¶ 9; Martin Dep., Doc. No. 118-1 at Page ID # 7893) ("It's [IMTT's] responsibility to make sure those railcars are load[ed] according to those regulations.").

24.     In short, the specific product (here, TDI) was piped from BASF's Geismar plant to the IMTT Geismar facility's storage tanks, and IMTT employees solely inspected and loaded the railcars for delivery to the railroad. (Dawson Dep., Doc. 108-1 at Page ID # 2676-2678; Martin Dep., Doc. No. 118-1 at Page ID # 8067).

25.     This railcar loading process was dictated through use of the IMTT formulated and generated TDI Checklist/Inspection Report, or the "IMTT load checklist," which was filled out by the IMTT loaders responsible for loading TDI railcars. (Martin Dep., Doc. No. 118-1 at Page ID # 7902-7903).

26.     The IMTT load checklist filled out for the Tank Car on February 19, 2019 is below:

(Dep. Ex. 136, Doc. 108-9 at Page ID # 3190-3192).

27.     IMTT's inspection included, but was not limited to, conducting a preload pressure check to ensure no valves were leaking or defective before the Tank Car was loaded with TDI. (Martin Dep., Doc. No. 118-1 at Page ID # 7908-7911).

28.     Should a railcar fail the preload pressure check or should a valve be found to not be working properly, the loader could not proceed with the loading process and IMTT notified the railcar owner (here, GATX) to conduct any needed repair. (Martin Dep., Doc. No. 118-1 at Page ID # 7911-7912, 7916-7917).

29.     A post-load pressure check was also performed on the load valves under thirty pounds of pressure to ensure no leaking or bubbling, which would signal a defective valve. (Martin Dep., Doc. No. 118-1 at Page ID # 7920, 7927).

30.     This post-load pressure check was part of the IMTT load checklist, which specified that this check was to be done after a railcar was loaded. (Dep. Ex. 136, Doc. 108-9 at Page ID # 3191).

31.     IMTT took photographs of the valves *after* its post-load pressure check but before the plug was placed in the top load valve to memorialize the validity of its test, such as the one below of the Tank Car:



(Martin Dep., Doc. No. 118-1 at Page ID # 7934; IMTT Photos, Doc. 129-7 at Page ID # 9671).

7

32.     If the IMTT inspection and testing was completed successfully and signed off on, the railcar met the requirements of the federal regulatory guidelines. (Martin Dep., Doc. No. 118-1 at Page ID # 7904; Viz Decl., Doc. 129-11 at Page ID # 9938 ¶ 10).

33.     Once the railcar was properly loaded and inspected and the IMTT load checklist was completed, IMTT "board operators" confirmed the volume that was loaded on the railcar. (Martin Dep., Doc. No. 118-1 at Page ID # 7951-7952).

34.     IMTT then sent the information relating to a particular railcar loaded for a particular customer to BASF via EDI into BASF's SAP system. (Martin Dep., Doc. No. 118-1 at Page ID # 7952).

35.     IMTT would not enter any data into BASF's SAP system if the tank car was not in proper/safe condition for transportation according to applicable Federal Regulations. (Martin Dep., Doc. No. 118-1 at Page ID # 7952, 7954-7955).

36.     BASF then sent the information via EDI to a third-party contractor, QTS, which then transmitted the EDI directly to the CN railroad. (Deposition of Stephanie O'Donnell, "O'Donnell Dep.," Doc. 110-1 at Page ID # 5067-5069, 5100-5101).

37.     BASF and IMTT are considered "co-offerors" of the shipment of TDI pursuant to the Federal Regulations. (Viz Decl., Doc. 129-11 at Page ID # 9938 ¶ 11; Reilly Dep., Doc. 108-3 at Page ID # 2828).

38.     The Federal Regulations allow there to be more than one offeror, with each offeror responsible for its specific pre-transportation functions. 49 CFR § 171.2(b); (Deposition of Anthony Ippolito, "Ippolito Dep.," Doc. 120-1 at Page ID # 8448-8449; Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 12).

39. As a co-offeror of TDI, BASF was entitled to rely upon IMTT's inspection of the railcars pursuant to applicable Federal Regulations. 49 CFR § 171.2(b); (Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 14).

40. PHMSA guidance also confirms that BASF's reliance upon the inspection performed by IMTT, as a co-offeror of the TDI, was wholly proper and in compliance with Federal Regulations. *See* PHMSA Interpretation Response #09-0064, 8 October 2009. Available at https://www.phmsa.dot.gov/regulations/title49/interp/09-0064 (last visited 5/26/25).

41. Pursuant to PHMSA guidance, BASF was "not required to perform the physical inspection of the cars" because IMTT "physically inspected the cars" while BASF "prepared the shipping documentation." *See* PHMSA Interpretation Response #04-0008, 26 May 2004. Available at https://www.phmsa.dot.gov/regulations/title49/interp/04-0008 (last visited 5/26/25).

## III. THE SUBJECT TANK CAR LOADING AND INSPECTION

42. On February 19, 2019, the day the Tank Car was loaded by IMTT, prior to its departure to Adient, IMTT completed its load checklist inspection and testing, which satisfied applicable Federal Regulations. (Viz Decl., Doc. 129-11 at Page ID # 9938 ¶ 10).

43. Brad Gremillion, the IMTT employee who doubled-checked the Tank Car's Subject Valve on this day testified that he observed no issues with any valve; if he had, he would have notified his supervisor, (Gremillion Dep., Doc. 119-1 at Page ID # 8229-8231), which he did not. (Gremillion Dep., Doc. 119-1 at Page ID # 8232).

44. He verified that, during his double-check, he did not observe anything wrong with the valves that would cause him to reject the Tank Car. (Gremillion Dep., Doc. 119-1 at Page ID # 8232).

45. Gremillion testified that his double-check also included checking the torque or tightness of bolts and plugs and a visual inspection of the Subject Valve itself. (Gremillion Dep., Doc. 119-1 at Page ID # 8231-8232).

46. Plaintiff's expert, Thomas Johnson, admitted that tool tightness of the plug was checked by IMTT by two separate employees, as required by the Federal Regulations. (Johnson Dep., Doc. 108-3 at Page ID # 2843-2844).

47. As a co-offeror with BASF of the TDI, IMTT was responsible for its specific pre-transportation functions that it agreed to perform, including its external visual inspections. (Martin Dep., Doc. No. 118-1, Page ID # 8063-8064; Ippolito Dep., Doc. 120-1 at Page ID # 8448-8449; Viz Decl., Doc. 129-11 at Page ID # 9939 ¶¶ 12, 14).

48. IMTT's load checklist and inspection report were fully completed on February 19, 2019. (Dep. Ex. 136, Doc. 108-9 at Page ID # 3190-3192).

49. IMTT also took photographs of the valves after loading, passing the post-load pressure test, and prior to departure, including photographs of the Subject Valve showing: (1) the Subject Valve without a plug in it; (2) the Subject Valve with Vaseline in it to ensure the Subject Valve would operate easily; and (3) the Subject Valve with the plug inserted:



(IMTT Photos, Doc. 129-7 at Page ID # 9672-9673; Martin Dep., Doc. No. 118-1, Page ID # 7926-7929).

50.     GATX also completed its visual inspection of the Tank Car that day, and there is no evidence that GATX identified any issues with the Tank Car. (Dep. Ex. 217, Doc. No. 118-3 at Page ID # 8162).

51.     When the Tank Car was picked up at IMTT by Canadian National Railroad, the railroad also inspected the car to ensure that it was safe for transportation, and it found the Tank Car was safe for transportation. (Ippolito Dep., Doc. 120-1 at Page ID # 8444-8445, 8447-8448).

52.     Indeed, the Tank Car completed its journey from Louisiana to Ohio without any identifiable release of TDI and with its closures in a tool-tight condition. (Reilly Report, Doc. 108-5 at Page ID # 3078; Viz Decl., Doc. 129-11 at Page ID # 9939 ¶ 13).

## IV.     BASF'S TDI CUSTOMER – ADIENT

53.     As of 2019, Adient at its Greenfield facility had long used TDI in the manufacturing process of foam seats for automobiles. (Deposition of Josh Postell, "Postell Dep.," Doc. 126 at Page ID # 8727; Deposition of Dalton Merritt, "Pl. Dep.," Doc. 108-20 at Page ID 3736; Deposition of Joseph Jones, "Jones Dep.," Doc. 112-66 at Page ID # 7234-7235).

54.     Adient employees who unloaded railcars were trained regarding safety protocols for working with or around TDI and PPE usage in annual HAZWOPER training. (Jones Dep., Doc. 112-66 at Page ID # 7231, 7237, 7240; Pl. Dep., Doc. 108-20 at Page ID # 3755).

55.     In addition, the SDSs from the TDI manufacturer, such as BASF, were available in hard copy for all employees in the breakroom and the tank farm. (Jones Dep., Doc. 112-66 at Page ID # 7232-7233).

56. Adient was aware of the steps that needed to be taken to protect its employees from the dangers of TDI and ensured its employees were aware of "the level of hazard" of TDI. (Postell Dep, Doc. 126 at Page ID # 8763-8764).

57. Adient testified that it was a "sophisticated user" of TDI and was fully aware of the hazards and dangers of working with TDI. (Jones Dep., Doc. 112-66 at Page ID # 7248).

58. Plaintiff was personally trained in the safe procedures for unloading TDI railcars for approximately six months in 2014. (Deposition of Larry Trefz, "Trefz Dep.," Doc. No. 112-65 at Page ID # 7135-7136, 7149-7150; Dep. Ex. 80, Doc. 126-1 at Page ID # 8982-8985; Dep. Ex. 82, Doc. 126-3 at Page ID # 9093; Pl. Dep., Doc. 108-20 at Page ID # 3738).

59. Plaintiff received safety training on the hazards of working with TDI and proper PPE usage. (Pl. Dep., Doc. 108-20 at Page ID # 3738-3740).

60. Plaintiff's training as a chemical process technician began with Plaintiff observing his trainer performing the tasks, then gradually completing tasks on his own. (Trefz Dep., Doc. 112-65 at Page ID # 7153).

61. Plaintiff was trained to open the dome lid on the railcar to access the valves, visually inspect the valve for residue, and "check[] the position of the handle." (Trefz Dep., Doc. 112-65 at Page ID # 7177-7178).

62. Plaintiff was trained by Trefz to use a pipe wrench to remove the load valve plug (which necessitates bending down near the Subject Valve's valve stem and handle making them easier to observe); but instead, in violation of his training, chose to use a 3-foot long t-handled wrench ("long t-wrench") the day of the Incident. (Trefz Dep., Doc. 112-65 at Page ID # 7184-7185; Pl. Dep., Doc. 108-20 at Page ID 3775, 3782).

63.     Plaintiff stated he only "sometimes" used a pipe wrench, which would require him to get on his knees and look at the valve stem. (Pl. Dep., Doc. 108-20 at Page ID # 3775-3776).

64.     Plaintiff's use of a long t-wrench, as opposed to a pipe wrench, on the day of the Incident explains why he only observed the Subject Valve's valve handle from "six feet away" and never bent down to look at the valve handle or the valve stem to see if it was out of position. (Pl. Dep., Doc. 108-20 at Page ID 3774-3775).

## V.  **THE INCIDENT**

65.     The Incident at the center of this litigation is a TDI release at Adient that occurred on March 13, 2019. (Pl. Dep., Doc. 108-20 at Page ID # 3735-3736).

66.     At the time of the Incident, Plaintiff was working as a chemical process technician at Adient's Greenfield, Ohio facility. (Pl. Dep., Doc. 108-20 at Page ID # 3735-3736).

67.     In his role as a chemical process technician, Plaintiff's duties included unloading tank trunks and railcars that carried chemicals for use in Adient's manufacturing process of making automotive car seats. (Pl. Dep., Doc. 108-20 at Page ID #3740).

68.     When Adient received a railcar, an Adient employee, like Plaintiff, ordered the railcar to be taken from the railyard onto the plant property where it was placed to be unloaded. (Deposition of Wendy Enzor-Carpenter, "Enzor-Carpenter Dep.," Doc. 112-7 at Page ID # 5631-5632).

69.     Plaintiff testified that "some day before" the date of the Incident, he had unlocked the dome on the Tank Car and checked the temperature of the TDI in the Tank Car. (Pl. Dep., Doc.108-20 at Page ID # 3794-3795).

70.     From the time he unlocked the Tank Car dome to the time he went to unload the Tank Car on the day of the Incident, the Tank Car sat unattended with an unsecured dome. (Pl. Dep., Doc. 108-20 at Page ID # 3795, 3878).

71.     The Incident occurred around 8 a.m. at Adient's railcar unloading rack. (Pl. Dep., Doc. 108-20 at Page ID # 3794; Dep. Ex. 128, Doc. 112-40 at Page ID # 6458-6459).

72.     At the time, Plaintiff was wearing what he described as a "Level B" air-supplied hood, chemical boots, overalls, and gloves supplied by Adient. (Pl. Dep., Doc. 108-20 at Page ID # 3782, 3784).

73.     A hose that hooked to the backside of his hood supplied positive fresh air pressure to keep any fumes out and was connected to the fresh air system inside of the plant. (Pl. Dep., Doc. 108-20 at Page ID # 3785).

74.     Plaintiff then began the offloading process for the Tank Car. (Pl. Dep., Doc. 108-20 at Page ID # 3782).

75.     After completing various tasks, Plaintiff testified that he took his tools – including the long t-wrench – to the top of the Tank Car. (Pl. Dep., Doc. 108-20 at Page ID # 3775, 3781-3782).

76.     While on top of the Tank Car, Plaintiff, who is six feet and five inches tall, (Dep. Ex. 97, Doc. 112-3 at Page ID # 5492), visually observed the Subject Valve from six feet away (by looking down at it) while wearing his PPE hood and observed that there was no indication of any leaks and that the valves were in the "closed" position. (Pl. Dep., Doc. 108-20 at Page ID # 3782).

77.     He noticed no damage to the Subject Valve's valve handle, but never observed the vale stem. (Pl. Dep., Doc. 108-20 at Page ID # 3774-3775, 3778).

78. It is important to visually inspect the valve stem prior to removing the plug to ensure that the valve stem is in the "closed" position, perpendicular to the flow of product. (Trefz Dep., Doc. 112-65 at Page ID # 7174-7175; Postell Dep., Doc. 126 at Page ID # 8815-8816).

79. Plaintiff testified that he did not see any product on the surface of Tank Car and that the Tank Car was properly placarded. (Pl. Dep., Doc. 108-20 at Page ID # 3757, 3762, 3848, 3877-3878).

80. Standing above the Subject Valve, using the long t-wrench, Plaintiff testified that he turned the plug in the Subject Valve "one and half to two and a half turns," and, at that point, product "began spewing everywhere." (Pl. Dep., Doc. 108-20 at Page ID # 3782).

81. After attempting and failing to close the plug with the long t-wrench, Plaintiff testified that he then got on his knees and tried to push the valve handle down, which led to him receiving "a surge of product" onto his "respirator hood" and onto his face shield. (Pl. Dep., Doc. 108-20 at Page ID # 3782-3783, 3785).

82. Plaintiff was able to stop the release of TDI by manipulating the valve handle. (Pl. Dep., Doc. 108-20 at Page ID # 3783).

83. Photographs of the Subject Valve, taken shortly after the Incident, depict the Subject Valve in the proper closed position (which is where a proper inspection would have noted it), with the valve stem perpendicular to the flow of product, but covered in neutralized TDI (which turns to hardened urea):



(Dep. Ex. 88, Doc. 126-6 at Page ID # 9111; Postell Dep., Doc. 126 at Page ID # 8822).

84. After stopping the release and activating the chemical alarm, Plaintiff used the decontamination shower on ground level, using "copious" amounts of water, as circled in the photo below:



(Pl. Dep., Doc. 108-20 at Page ID # 3783, 3803; Dep. Ex. 93, Doc. 126-8 at Page ID # 9113) (circle added).

85.     At that point, his supplied air via hose attached to his hood was functioning properly. (Pl. Dep., Doc. 108-20 at Page ID # 3789-3790).

86.     Plaintiff then went back to the top of the Tank Car to secure the Subject Valve by putting the plug in and tightening the plug with the long t-wrench, as shown in the photo below:



(Pl. Dep., Doc. 108-20 at Page ID # 3797-3798; Dep. Ex. 128, Doc. 112-40, Page ID # 6458-6459; Dep. Ex. 91, Doc. 126-7 at Page ID # 9112).

87.     Afterward, he sprayed himself with neutralizer that had been provided by plant personnel, which he also rinsed off in the decontamination shower. (Pl. Dep., Doc. 108-20 at Page ID # 3783, 3798-3799; Dep. Ex. 128, Doc. 112-40 at Page ID # 6458-6459).

88.     After showering, Plaintiff's plant air supply unexpectedly shut off. (Pl. Dep., Doc. 108-20 at Page ID # 3783-3784, 3799; Dep. Ex. 128, Doc. 112-40 at Page ID # 6458-6459).

89.     According to Plaintiff, "[w]hen you lose your positive pressure, there's – you know, you lose your safety barrier essentially." (Pl. Dep., Doc. 108-20 at Page ID # 3784).

90.     He began inhaling TDI fumes. (Dep. Ex. 128, Doc. 112-40 at Page ID # 6459).

91.     His air supply briefly turned back on but was cut off again. (Pl. Dep., Doc. 108-20 at Page ID # 3800).

92.    Plaintiff explained that he banged on the plant door and yelled for his air to be turned back on, to no avail. (Pl. Dep., Doc.108-20 at Page ID # 3800).

93.    Plaintiff testified that he then opened the door to the plant, pulled off his hood, and yelled into the plant "I need air out here. I can't breathe." (Pl. Dep., Doc.108-20 at Page ID # 3800; Dep. Ex. 128, Doc. 112-40 at Page ID 6459).

94.    When his air supply remained turned off, he decided, now breathing TDI fumes, to "save his own life and self-rescue himself." (Dep. Ex. 128, Doc 112-40 at Page ID # 6459).

95.    Plaintiff testified that it came as a "complete surprise" that his air was cut off as it had never happened before. (Pl. Dep., Doc. 108-20 at Page ID # 3886).

96.    Plaintiff, with no plant supplied fresh air, stretched his non-functioning air hose as far as possible to the other side of the railroad tracks, which was still in the "hot zone" of TDI in the air. (Pl. Dep. Doc. 108-20 at Page ID # 3800-3801, 3803-3804).

97.    Plaintiff explained that the connected air hose was long enough to allow the user to get inside the plant, but he would not have been able to close the door all the way or get away from fumes during a release. (Pl. Dep., Doc.108-20 at Page ID # 3788).

98.    After stretching his non-functioning air hose as far as it could go, he took a deep breath (breathing fumes), held his breath and disconnected. (Pl. Dep., Doc.108-20 at Page ID # 3784, 3801-3803).

99.    He then took off his hood, gloves, and suit and ran. (Pl. Dep., Doc.108-20 at Page ID # 3784, 3801-3803).

100.    He then stood in "the warm zone" until first responders arrived to decontaminate him. (Pl. Dep., Doc.108-20 at Page ID # 3784).

## VI.    INCIDENT INVESTIGATION BY ADIENT

101.    Josh Postell, Adient process manager, and Joseph Jones, Adient's environmental manager, both participated in Adient's investigation of the Incident and Adient's 8D Problem Analysis Report, which identified the root causes of Plaintiff's exposure. (Postell Dep., Doc. 126 at Page ID # 8846-8847; Jones Dep., Doc. 112-66, Page ID # 7224-7225; Dep. Ex. 94, Doc. 126-9 at Page ID # 9118-9120).

102.    The root causes of the exposure were described by Adient as follows:

- Employee did not leave area immediately after release was stopped.
- Team members was [*sic*] trying to contact [*sic*] a hose that did not have correct fitting.
- Valves on ENMET system are not labeled.
- Employee did not contact assistance to be present when connecting to railcar…

(Dep. Ex. 94, Doc. 126-9 at Page ID # 9119).

103.    "ENMET" is the fresh air supply system connecting Plaintiff's hood to the fresh air supply in plant via hose. (Jones Depo., Doc. 112-66 at Page ID # 7279).

104.    Both Mr. Jones and Mr. Postell confirmed that Plaintiff's air supply was cut off due to confusion on the part of Adient personnel as to the correct connection for Plaintiff's air supply hose. (Jones Dep., Doc 112-66 at Page ID # 7338; Postell Dep., Doc. 126 at Page ID # 8851-8852).

105.    Mr. Postell agreed that this occurrence was "unexpected and unanticipated." (Postell Dep., Doc. 126 at Page ID # 8853).

106.    Indeed, there had never been a TDI railcar leak or release at Adient's Greenfield facility before. (Postell Dep., Doc. 126 at Page ID # 8767-8768; Pl. Dep., Doc. 108-20 at Page ID # 3748).

107.    Mr. Jones also explained that all Adient employees who unload railcars are trained to fill out its "TDI Unload Checklist," which Plaintiff openly admitted that he did not do. (Jones

19

Depo., Doc. 112-66 at Page ID # 7283-7284; Pl. Dep., Doc. 108-20 at Page ID # 3768-3769; Postell Dep., Doc. 126 at Page ID # 8794).

108.    Mr. Postell explained that it was determined that a second person should have been present when connecting and disconnecting equipment, but Plaintiff also failed to follow Adient this procedure. (Postell Dep., Doc. 126 at Page ID # 8790).

109.    Mr. Jones also confirmed that, according to Adient's procedure, Plaintiff should have immediately evacuated the area, instead of spraying himself with neutralizer and attempting to clean up, as that is "not [Adient's] procedure." (Jones Dep. Doc. 112-66 at Page ID # 7328-7329).

110.    He also testified that had Plaintiff left the area as he was trained to, he would have avoided inhaling any chemical fumes. (Jones Dep. Doc. 112-66 at Page ID # 7330-7331).

111.    Although it was Adient's responsibility to supply PPE to its employees, (Jones Dep., Doc. No. 112-66 at Page ID # 7239-7240, 7252, 7254), Adient failed to do so here. (Pl. Dep., Doc. 108-20, Page ID # 3805, 3807; Declaration of John W. Spencer, C.I.H., C.S.P., "Spencer Decl.," Doc. 129-8 at Page ID # 9680 ¶ 6).

112.    BASF's SDS for TDI, provided to Adient and used in Adient's training with respect to TDI, (Postell Dep., Doc. 126 at Page ID # 8761-8762; Dep. Ex. 9A, Doc. 108-2 at Page ID # 2716), requires use of a "NIOSH-certified full facepiece pressure demand self-contained breathing apparatus (SCBA) *or* a full facepiece pressure demand supplied-air respirator (SAR) ***with escape provisions***." (Dep. Ex. 9A, Doc. 108-2 at Page ID # 2716; Spencer Decl., Doc. 129-8 at Page ID # 9680 ¶ 8) (emphasis added).

113.    Occupational Safety and Health Administration ("OSHA") guidance required the same "[p]ositive pressure, full-facepiece self-contained breathing apparatus (SCBA), or positive

pressure supplied air respirator **with escape SCBA** (NIOSH approved)" (Appendix B to 29 CFR §

1910.120 Part A) (emphasis added), and Adient's own HAZWOPER training required the same

escape air to be provided. (Jones Dep., Doc. 112-66 at Page ID # 7251; Dep. Ex. 81, Doc. 126-2

at Page ID # 8986-9092; Spencer Decl., Doc. 129-8 at Page ID # 9680 ¶ 7).



181

(Dep. Ex. 81, Doc. 126-2 at Page ID # 9031) (circle added).

114.    This is the same escape air provisions that IMTT TDI railcar loaders wear on a

daily basis in case something happens with the plant air. (Martin Dep., Doc. No. 118-1 at Page ID

# 7899; Gremillion Dep. Doc. 119-1 at Page ID # 8206, 8320-8321).

115.    Plaintiff admits that he knew what "escape air" was from his firefighting training,

but that he was not provided an "escape air" bottle by Adient; nor did he receive any training by

Adient on using escape air (other than what was in the HAZWOPER training slides). (Pl. Dep.,

Doc. 108-20 at Page ID # 3805, 3807).

116. The purpose of the escape air bottle is to provide about five minutes of clean air in case the plant air supply gets interrupted, as here, in the event of a spill or release (Pl. Dep., Doc. 108-20 at Page ID #3806-3807).

117. In fact, contrary to OSHA regulations, Adient's HAZWOPER training, and BASF's SDS, (Dep. Ex. 9A, Doc. 108-2 at Page ID # 2716), Adient did not provide escape air to employees unloading TDI railcars. (Jones Dep., Doc. 112-66 at Page ID # 7260-7261; Dep. Ex. 9A, Doc. 108-2 at Page ID # 2716).

**VII.  POST-INCIDENT SUBJECT VALVE INSPECTION AND TESTING**

118. James Kennedy, the GATX employee who drafted GATX's Summary of Findings dated June 4, 2019, inspected the Subject Valve months after the Incident and testified that his testing only was done post-Incident and that, as of the time of the Incident, he "can't answer the condition [the valve] was in; but only the received condition when [he] got the valve." (Deposition of James Kennedy, "Kennedy Dep.," Doc. 108-26 at Page ID # 4011).

119. He admitted that because he was "not there when the car was loaded," it was *not* fair to conclude that the issues identified in his report "existed when the car was loaded." (Kennedy Dep., Doc. 108-26 at Page ID # 4016-4018).

120. He testified that he could not move the ball valve handle when he received the Subject Valve in June 2019 because of the buildup of hardened product; the Subject Valve was steam-cleaned, but a large amount of urea remained on and in the Subject Valve. (Kennedy Dep., Doc. 108-26 at Page ID # 4026-4028).

121. The Subject Valve's handle was "frozen" in the open position, despite post-Incident photos of the Subject Valve in the closed position. (Dep. Ex. 137, Doc. 108-10 at Page ID # 3193-3194).

22

122.    The Subject Valve was kept by third-party, Enviroserve, for months until it was shipped to BASF near the end of May 2019. (Dep. Ex. 137, Doc. 108-10 at Page ID # 3193-3194).

123.    The large amount of remaining urea, which is yellow in color, can be seen in photos taken during the GATX inspection:



(Dep. Ex. 2, Doc. 108-28 at Page ID # 4076).

124.    In its Concern 8D Report dated June 14, 2019, BASF, which relied upon the GATX report, identified the "root cause" of the TDI release as follows: "the valve handle, stop and innerworkings were compromised." (Dep. Ex. 4, Doc. 87-10 at Page ID #1158-1159; Dawson Dep., Doc. 108-1 at Page ID # 2629-2630).

125.    One of the authors, Joe Dawson, testified that he did not know the condition of the Subject Valve pre-release. (Dawson Dep., Doc. 108-1 at Page ID # 2655-2656).

126.    Mr. Dawson also testified that the Subject Valve had "quite a bite of residue" on it and that he did not know "the condition the valve was in at the customer." (Dawson Dep., Doc. 108-1 at Page ID # 2649, 2656).

127.    Plaintiff's railroad engineering expert, Thomas Johnson, also conducted testing in May 2024 on the Subject Valve and concluded that the Subject Valve was "defective." (Johnson Dep., Doc. 108-31 at Page ID # 4105-4106, 4227).

128.    Johnson admitted that he performed his testing *after* the Incident and after there was still product buildup on <u>and</u> in the Subject Valve. (Johnson Dep., Doc. 108-31 at Page ID # 4105, 4112-4113, 4185-4186).

129.    He also admitted that he has no evidence that the Subject Valve "leaked TDI product after it was loaded" on the date of the Incident or in February 2019 when the Tank car was loaded. (Johnson Dep., Doc. 108-31 at Page ID # 4203).

130.    Notably, BASF's expert, Dr. Eric Guyer, who specializes in failure analysis and metallurgy, concluded that:

> The condition of the Subject Valve *changed* because of the incident; conclusions and observations regarding the condition of the valve based on inspections conducted *post-incident are unreliable indicators* as to the condition and operability of the valve prior to the incident.

(Declaration of Eric P. Guyer, Ph.D., P.E., "Guyer Decl.," Doc. 129-10 at Page ID # 9862 ¶ 7) (emphasis added).

131.    As Dr. Guyer explained:

> [T]he incident itself altered the condition of the valve, and the valve condition further changed due to cleaning and disassembly after the incident (before any experts, including myself or Plaintiff's experts, had the opportunity to examine it).

(Guyer Decl., Doc. 129-10 at Page ID # 9862 ¶ 8).

132.    Dr. Guyer explained the inability to seal the Subject Valve during the May 2024 inspection is not representative of the Subject Valve's condition when it left IMTT on February 19, 2019 because the inspection itself damaged the valve body, causing the Subject Valve to no longer be able to seal properly. (Guyer Decl., Doc. 129-10 at Page ID # 9861 ¶ 9).

133.    Further, Dr. Guyer stated that during GATX's inspection the handle was removed from the Subject Valve and was subsequently reinstalled on the Subject Valve, but there is no

indication that the handle was tightened down to the recommended torque. (Guyer Decl., Doc. 129-10 at Page ID # 9862-9863 ¶ 10).

134.    Additionally, hardened commodity was observed on the exterior and within the interior of the Subject Valve, even following steam cleaning. (Guyer Decl., Doc. 129-10 at Page ID # 9862-9863 ¶ 10).

135.    As such, GATX's inspection report is unreliable as to the condition of the Subject Valve at the time of the Incident. (Guyer Decl., Doc. 129-10 at Page ID # 9862-9863 ¶ 10).

## VIII.   PLAINTIFF'S ALLEGED INJURIES AND DAMAGES

136.    Plaintiff's medical causation expert, Dr. Chiodo, opines that Plaintiff's exposure to TDI caused Plaintiff to contract "both Reactive Airways Dysfunction Syndrome ("RADS") as well as allergic sensitization to TDI." (Dep. Ex. 126, Doc. 112-38 at Page ID # 6441-6442, 6446).

137.     However, Dr. Chiodo never performed a dose reconstruction to model the amount of TDI to which Plaintiff was exposed and merely assumes that Plaintiff was exposed to an amount capable of causing RADS. (Deposition of Ernest Chiodo, "Chiodo Dep.," Doc. 112-36 at Page ID # 6277-6278, 6292-6293).

138.    In fact, Dr. Chiodo never examined Plaintiff, and only spoke with him remotely via Zoom. (Chiodo Dep., Doc. 112-36 at Page ID # 6339-6341).

139.    A pulmonologist who actually examined Plaintiff in 2019 and has authored peer-reviewed articles on RADS, Dr. Lockey, opined that Plaintiff does *not* have RADS, but rather mild occupational asthma. (Deposition of James Lockey, M.D., "Lockey Dep.," Doc. 112-55 at Page ID # 6858-6859).

140.    Further, the evidence is unrebutted that Plaintiff was obese at the time of the Incident in 2019; his treating health care provider listed his weigh as 350 pounds in March 2019. (Dep. Ex. 97, Doc. 112-3 at Page ID # 5492).

141.    Dr. Lockey, in his contemporaneous records, recommended a "weight reduction program" through "diet and exercise" when he saw Plaintiff in 2019. (Lockey Dep., Doc. 122-55 at Page ID # 6879-6880).

142.     For purposes of this litigation in 2024, Dr. Lockey discussed with Plaintiff's life care planning expert, Marianne Boeing, that Plaintiff could benefit from use of a prescription weight loss medication for a few months (despite no treating physician even prescribing the medication). (Lockey Dep., Doc. 122-55 at Page ID # 6916-6918).

143.    Even so, Dr. Lockey openly admits that Plaintiff was morbidly obese *prior to* the Incident in 2019. (Lockey Dep., Doc. 122-55 at Page ID # 6874-6876, 6894).

144.    Similarly, Plaintiff's life care planning expert, Marianne Boeing, who admits that Plaintiff was obese *before* the Incident, (Deposition of Marianne Boeing, "Boeing Dep.," Doc. No. 112-50 at Page ID # 6729-6731), testified that the "majority" of the medication cost in her life care plan is for a lifetime of weight loss drugs. (Boeing Dep., Doc. No. 112-50 at Page ID # 6717-6718; Dep. Ex. 175, Doc. 112-49 at Page ID # 6618, 6620-6626).

145.    In fact, the lifetime cost of these prescription weight loss drugs accounts for more than 95% of Plaintiff's claimed damages for future medical costs. (Dep. Ex. 175, Doc. 112-49 at Page ID # 6620, 6623, 6626).

146.    This lifetime need for prescription weight loss medication contradicts Dr. Lockey's recommendation of a six-month course of the drug. (Lockey Dep. Doc. 112-55 at Page ID # 6917-6918).

147. Plaintiff's vocational expert, Dr. Manges, opined that Plaintiff's exposure to TDI caused him to "end[] his career" and that Plaintiff would have become an Adient "process manager" with a salary of $100,850.00 "had it not been for the March 2019 exposure of TDI." (Dep. Ex. 123, Doc. 112-34 at Page ID # 6203).

148. Additionally, Plaintiff makes a higher salary now than he did when he worked at Adient. (Dep. Ex. 123, Doc. 112-34 at Page ID # 6194, 6197).

149. However, Manges admits he never independently investigated whether Plaintiff had the necessary education and skills to be promoted to that position; nor does Manges know the actual salary of an Adient process manager. (Deposition of Ken Manges, "Manges Dep.," Doc. 112-32 at Page ID # 6112, 6114-6115).

150. Indeed, Manges' report explains that Plaintiff "is functioning at the 8th grade 4th month, 13th percentile on his reading ability" and "would have difficulty with understanding the meaning of words or communicating and understanding language above the high school level." (Dep. Ex. 123, Doc. 112-34 at Page ID # 6197).

151. Next, Dr. Rosen's calculation of Plaintiff's loss of earning capacity is based solely on the baseless assumption that Plaintiff's earnings would jump to those of a process manager in 2024 and continue for years to come until retirement. (Dep. Ex. 174, Doc. 112-48 at Page ID # 6581; Deposition of Harvey Rosen, "Rosen Dep.," Doc. 112-43 at Page ID # 6524-6526).

152. Based on this pure assumption, Rosen estimates that Plaintiff's diminished earning capacity is a range from $773,972 - $924,822. (Dep. Ex. 174, Doc. 112-48 at Page ID # 6581).

153. Rosen also blindly accepted Boeing's lifetime medication opinion, with no investigation as to whether it was supported by any medical professional, opining that the present value of future care outlined in the life care plan is either $425,633 or $427,781—more than 95%

27

of which represents the cost of a lifetime supply of weight loss medication. (Rosen Dep., Doc. 112-43 at Page ID # 6516-6518; Dep. Ex. 174, Doc. 112-48 at Page ID # 6592).

154.    Meanwhile, BASF's pulmonology expert, Gregory Diette, M.D., opines that since the Incident, Plaintiff has gained excellent control of his asthma, and concludes that the TDI exposure did not cause a permanent or abnormal decline in lung function. (Declaration of Gregory B. Diette, M.D., M.H.S., "Diette Decl.," Doc. 129-9 at Page ID # 9724 ¶¶ 4-5).

155.    Dr. Lockey testified that, at least as of 2022, Plaintiff's lung volume was normal except for "ERV reduced;" as Dr. Lockey concedes, "ERV can be reduced with people who are markedly overweight or have morbid obesity." (Lockey Dep., Doc. 112-55 at Page ID # 6906-6907).

156.    Because Plaintiff was morbidly obese prior to the Incident, Diette also concludes that the TDI exposure did not cause his obesity. (Diette Decl., Doc. 129-9 at Page ID # 9724 ¶ 6).

157.    Diette additionally concludes that Plaintiff's asthma may have been present for years prior to the Incident. (Diette Decl., Doc. 129-9 at Page ID # 9724 ¶ 7).

158.    Further, weight loss has been suggested for Plaintiff because of his obesity for many years, and Dr. Diette opines that it is premature to require Plaintiff to use weight loss prescription drugs before he has attempted a comprehensive approach to weight loss, which would include calorie restriction, exercise, and behavior modification. (Diette Decl., Doc. 129-9 at Page ID # 9725 ¶ 8).

Dated: May 30, 2025

Respectfully submitted,

*/s/ Timothy J. Coughlin*
Timothy J. Coughlin (0019483)
Tim.Coughlin@thompsonhine.com
Andrea B. Daloia (0074016)
Andrea.Daloia@thompsonhine.com
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone:  (216) 566-5500
Facsimile:  (216) 566-5800

Emily G. Montion (0093625)
Emily.Montion@thompsonhine.com
Brianna D. Vollman (0101144)
Brianna.Vollman@thompsonhine.com
**THOMPSON HINE LLP**
312 Walnut Street
Suite 2000
Cincinnati, OH 45202-4024
Telephone:  (513) 352-6700
Facsimile:  (513) 241-4771

*Attorneys for Defendant BASF Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, a copy of foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Timothy J. Coughlin*